*927 OPINION OF THE COURT
Joseph Harris, J.
PREFACE
In mythological times fire was the exclusive property of the gods. When Prometheus, a Titan, broke the monopoly of the gods and brought the gift of fire to mankind, so incensed were the gods that they caused Prometheus to be chained to a great rock where during the day an eagle devoured his liver. During the night his liver regenerated and the process continued until Prometheus was freed by Hercules.
We turn now to the real world. Fire no longer belongs to the gods, but to the People. The overriding issue of this case is the mode to be followed by the People for generation, transmission and distribution of fire, transmogrified in the context of this case into electric energy — monopolistic or competitive, or some gradation in between.
There is no question that the People, acting through their Legislature, have the ultimate right to choose — now and for the future of the 21st century and for all times — what that mode — shall look like. Nor is there any question but that the Legislature of the State of New York — which is the embodiment of the People of the State of New York — has the right to delegate the necessary choices to the Public Service Commission (PSC) as its action arm, provided that the Legislature promulgates necessary and appropriate guidelines for the exercise of those choices, so that those choices will represent not the purely independent choice of the said PSC, but the intent of the Legislature.
The only question remaining, respecting the several particularized issues of this case, and the authority of the PSC to so act upon, is whether or not the Legislature has properly delegated to the PSC the necessary authority. This court finds it has. The Public Service Law is a blueprint within which the Public Service Commission is charged with the governance of the energy resources of the State of New York within the guidelines therein set forth!
THE FACTS
In March 1993 the PSC commenced the Herculean task of smoothing New York’s transition to an increasingly competitive electric industry by instituting phase I of an administrative proceeding designed to discuss, investigate and address relevant issues.
*928 Phase II commenced in August 1994 "to identify regulatory and ratemaking practices that will assist in the transition to a more competitive electric industry designed to increase efficiency in the provision of electricity while maintaining safety, environmental, affordability, and service quality goals.”[1] This involved a broad and intensive collaboration on the part of the electric utilities and the PSC to develop potential models for restructuring the electric industry, culminating on May 20, 1996 with the issuance by the PSC of Opinion No. 96-12.[2]
Opinion No. 96-12 contains three steps: (1) orders electric utilities to file plans on how they would restructure in a competitive marketplace; (2) rejects the utilities’ claim that consumers, as a matter of law, must pay rates designed to recover every dollar of stranded costs,[3] regardless of origin and ratepayer impact, reserving the issue for a factual case-by-case analysis and determination; and (3) sets forth a PSC policy statement on electric competition (Vision Policy).
THE ISSUES
The utilities’ petition raises four issues: (1) Did the PSC have jurisdiction to require utility filings? (the PSC’s response is in the affirmative); (2) Did the PSC’s rejection of the utilities’ demand that all competitive losses be borne by consumers, breach a regulatory compact, violate the Public Service Law, or infringe on the utilities’ constitutional rights? (in each category the response of the PSC is in the negative); (3) Did the PSC fail to comply with the State Administrative Procedure Act? (the response of the PSC is in the negative); (4) May a utility challenge a policy statement which is nonjusticiable because it does not order the actions which the utilities contest? (the response of the PSC is in the negative).
Further, although the PSC did not order the utilities to sell assets or carry electricity of other providers and did not *929 deregulate generation, the utilities ask the court to declare whether the PSC has jurisdiction to do so. The PSC contends that these jurisdictional issues are nonjusticiable and do not state a cause of action.
The court wishes to make crystal clear that on factual issues and decisions, unless same are obviously arbitrary and capricious, the court must defer to the expertise of the PSC and not attempt to superimpose its own factual perceptions. Factual determinations are the province of the People, acting through their representatives, the Legislature, and the PSC insofar as authority is properly delegated thereto; only the law is the province of the court, limited solely to the question as to whether legal authority existed for the actions of the PSC — not the merits of those actions.[4] (See, Matter of New York Tel. Co. v Public Serv. Commn., 98 AD2d 535 [1984].)
THE LAW
Re: The Power of the PSC to Require Regulated Utilities to File Plans
Section 5 (2) was added to the Public Service Law in 1970. It was a revolutionary enhancement of the functions of the PSC in the management and control of the electrical industry in the State of New York, transforming the traditional role of the Commission from that of an instrument for a simple case-by-case consideration of rates requested by utilities to one charged with the duty of long-range planning for the public benefit. In his approval memorandum, Governor Rockefeller stated in clarion tones a call for the electrical industry of New York State to enter the new world of modern technology:
"This bill * * * makes the first basic reorganization in the structure of the Public Service Commission * * * By changing the Commission’s direction, composition and operations, it will enable the Commission to meet the challenges of modern technology, now and in the future, and to respond more fully to public need.
"The bill specifically directs the Commission to encourage utilities subject to its jurisdiction to formulate and carry out long-range programs, both individually and cooperatively, for the performance of their responsibilities with economy, efficiency and care for public safety, preservation of environmental *930 values and conservation of natural resources. Recognition of the interdependence of these factors and of the crucial importance, of long-range planning for the public weal represents a major departure from existing responsibilities of the Commission, which have traditionally been confined to case by case consideration of rates, service levels and franchises.” (Governor’s Mem approving L 1970, ch 155,1970 NY Legis Ann, at 475.)
Simply, Public Service Law § 5, entitled "Jurisdiction, powers and duties of public service commission”, in subdivision (2) thereof, states: "The commission shall encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs, individually or cooperatively, for the performance of their public service responsibilities with economy, efficiency, and care for public safety, the preservation of environmental values and the conservation of natural resources.”
Moving out from this basic charge, Public Service Law § 65 (1) declares: "Every gas corporation, every electric corporation and every municipality shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable.” (Emphasis supplied.)
Section 66 of the Public Service Law is entitled "General powers of commission in respect to gas and electricity”. Subdivision (1) declares that the Commission shall: "1. Have general supervision of all gas corporations and electric corporations”.
Section 66 (10) recites in pertinent part: "The commission may require of all such corporations, persons or municipalities, specific answers to questions upon which the commission may need information, and may also require such corporations, persons or municipalities to file periodic reports in the form, covering the period and filed at the time prescribed by the commission.”
And ultimately Public Service Law § 4 (1) recites: "There shall be in the department of public service a public service commission, which shall possess the powers and duties hereinafter specified, and also all powers necessary or proper to enable it to carry out the purposes of this chapter. ” (Emphasis supplied.)
Petitioners acknowledge that Public Service Law § 66 (10) empowers the Commission to require answers to specific questions "upon which the [PSC] may need information” but contest *931 the applicability of section 66 (10) by claiming that "the Commission may not require the utilities to file plans that include actions that are beyond the Commission’s legal authority to mandate”.
Their position is without merit. The PSC has jurisdiction over utility rates, services and long-range economic planning. (Public Service Law § 5 [2]; §§ 65, 66 [10];§ 4 [1].)
As stated by the Court of Appeals in Matter of Consolidated Edison Co. v Public Serv. Commn. (47 NY2d 94, 102-103 [1979], revd on other grounds 447 US 530): "In light of current exigencies, one of the policies of any public service legislation must be the conservation of our vital and irreplaceable resources. The Legislature has but recently imposed upon the commission a duty to 'encourage all persons and corporations * * * to formulate and carry out long-range programs * * * [for] the preservation of environmental values and the conservation of natural resources’ (Public Service Law, § 5, subd 2). Implicit in this amendment is a legislative recognition of the serious situation which confronts our State and Nation. More important, conservation of resources has become an avowed legislative policy embodied in the commission’s enabling act (see, also, Matter of New York State Council of Retail Merchants v Public Serv. Comm. of State of N. Y., 45 NY2d 661, 673-674).”
The PSC’s action in Opinion 96-12, requiring the regulated electric utilities to file plans to "carry out long-range programs * * * for the performance of their public service responsibilities with economy, efficiency, and care for * * * the conservation of natural resources” (Public Service Law § 5 [2]), being expressly authorized by Public Service Law § 5 (2); §§ 65, 66 (10) and § 4 (1), there is no conflict with Boreali v Axelrod (71 NY2d 1). (See, Matter of Multiple Intervenors v Public Serv. Commn., 166 AD2d 140 [3d Dept 1991].)[5]
*932 MONOPOLISTIC AND COMPETITIVE CONSIDERATIONS OF OPINION 96-12
State and Federal antitrust laws, as well as antidiscrimination provisions of the Public Service Law, prohibit utilities from denying competitors use of their distribution facilities in order to maintain monopolies. (See, General Business Law § 340 [Donnelly Act]; 15 USC § 2 [Sherman Anti-Trust Act]; Public Service Law § 65 [2].)
In their petition, petitioners ask the court to declare that the PSC may not direct retail wheeling, generation deregulation or asset divestiture.
The Commission has not in fact directed these actions; thus a justiciable controversy is not presented. (See, Cuomo v Long Is. Light. Co., 71 NY2d 349 [1988].) Unless and until the Commission takes directive action there is no justiciable controversy. (See, Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510 [1986], cert denied 479 US 985 [1986].) Because the PSC has not in fact ordered utilities either to sell assets or carry the electricity of others (retail wheeling), and has not in fact modified its regulation of the generation of electricity, the areas of the petition dealing with these issues do not state a cause of action. (See, Matter of Jamaica Water Supply Co. v Public Serv. Commn., 152 AD2d 17 [3d Dept 1989].)
The Commission policy statement adopted the principle of retail wheeling (utilities carrying electricity to end users in return for a reasonable retail wheeling rate) (without directing same), and established, as a goal, a January 1, 1998 implementation date. No direction was necessary because electricity rates have yet to be "unbundled” (i.e., disassembled and broken into their component parts), open transmission access has not yet taken effect, and given the "essential facilities” doctrine of the antitrust laws and antidiscrimination provisions of the Public Service Law, a retail wheeling directive ought not to be necessary.[6]
Nevertheless, petitioners assert that the Commission allegedly lacks authority under the Public Service Law to order retail wheeling, and that in addition, the issue of retail wheeling is preempted by the Federal Power Act. In addition to the fact that the PSC has not ordered retail wheeling, the position of the petitioners above set forth is clearly without merit. A specific grant of authority in the Public Service Law, authoriz *933 ing retail wheeling under specific circumstances, may not be construed to defeat an agency’s ability to implement broad remedial powers under other circumstances. (See, McKinney’s Cons Laws of NY, Book 1, Statutes §§ 96, 97, 321, 341; Matter of Bath & Hammondsport R. R. Co. v New York State Dept. of Envtl. Conservation, 73 NY2d 434, 440 [1989]; see also, Public Service Law § 65 [1] [assure the provision of safe and adequate electricity service at rates that are "just and reasonable”]; § 65 [3] [require utilities to provide services in a nondiscriminatory manner]; § 66 [1] [exercise general supervision of all electric corporations and plants]; § 4 [1] [exercise "all powers necessary or proper to enable it to carry out the purposes” of the Public Service Law].)
Refusal to deliver a competitor’s electricity, while delivering one’s own, would create a preferential use of the distribution system (contrary to Public Service Law § 65 [3]) and otherwise violate State and Federal antitrust laws.
Utility services have traditionally been "bundled” (i.e., customers have paid for all elements — generation, transmission, delivery, customer billing) in a single rate. Over the last two decades, however, State and Federal regulators have "unbundled” or disaggregated telephone and natural gas service into discrete components in order to engender competition for the unbundled element. (See, Associated Gas Distribs. v Federal Energy Regulatory Commn., 824 F2d 981 [DC 1987], cert denied sub nom. Interstate Natural Gas Assn. v Federal Energy Regulatory Commn., 485 US 1006 [1988] [wherein the DC Circuit Court of Appeals affirmed a decision of the Federal Energy Regulatory Commission that "bundled” gas rates were anticompetitive and, therefore, in order to achieve "just and reasonable” rates had to be unbundled]; see also, MCI Telecommunications Corp. v Federal Communications Commn., 561 F2d 365 [DC 1977], cert denied 434 US 1040 [1978] [overturning an FCC decision that failed to require a regulated utility to provide access to its network].)[7]
The Public Service Law must not be restrictively read, lest as stated by the Court of Appeals in Matter of New York Tel. *934 Co. v Public Serv. Commn. (72 NY2d 419, 427-428 [1988]), "[s]uch a restricted reading of Public Service Law § 110 (3) would frustrate the very ameliorative purpose of the legislation”. And in Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. (69 NY2d 365, 372 [1987]), said Court, in upholding a PSC decision ordering refunds of previously recovered fuel expenses and reversing the Appellate Division’s reading of the Public Service Law, called for " 'a realistic appraisal of a particular situation to determine whether the administrative action reasonably promotes or transgresses the pronounced legislative judgment’ ”.
In Otter Tail Power Co. v United States (410 US 366, 374 [1973]) the United States Supreme Court held that courts may order retail wheeling to remedy antitrust violations.
As far back as 1919, then Judge (later United States Supreme Court Justice) Benjamin Cardozo wrote in Matter of Pennsylvania Gas Co. v Public Serv. Commn. (225 NY 397, affd 252 US 23 [1920]) that utilities using governmental power of eminent domain and using public rights-of-way have an "inherent duty” to serve that public.
Neither is the PSC preempted from effectuating retail wheeling by any Federal law. Section 201 (b) of the Federal Power Act limits the jurisdiction of the Federal Energy Regulatory Commission (FERC) to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce”. (16 USC § 824 [b].) Further, section 201 (a) of the Federal Power Act declares that "Federal regulation * * * extend[s] only to those matters which are not subject to regulation by the States.” (16 USC § 824 [a].) Finally, that retail wheeling is the province of State jurisdiction, becomes crystal clear from section 212 (g) of the Federal Power Act, wherein it is stated that "[n]o order [requiring transmission service] may be issued * * * which is inconsistent with any State law which governs the retail marketing areas of electric utilities.” (16 USC § 824k [g]; see also, Energy Policy Act of 1992 [Pub L 102-486, 106 US Stat 2776] [in which Congress reaffirmed that the regulation of retail electric sales is a matter of State jurisdiction].)
Petitioners’ constitutional claims against retail wheeling center around their contention that requiring them to carry competitors’ electricity would amount to a "taking”, even though said competitors would be required to pay "just and reasonable” rates. The argument then switches to the conten *935 tion of petitioners that they must be afforded full "stranded costs”.[8]
In Loretto v Teleprompter Manhattan CATV Corp. (458 US 419, 430 [1982]) the United States Supreme Court did indeed hold a New York statute mandating a permanent attachment of cable television wires to a private building amounted to a taking, but carefully emphasized the vital distinction between a permanent, physical occupation by a private enterprise and "a regulation that merely restricts the use of property.” Retail wheeling is not affected by this holding inasmuch as the carrying of a competitor’s electricity is not a permanent, physical occupation, and further, that utilities are quasi-public. In Rochester Gas & Elec. Corp. v Public Serv. Commn. (71 NY2d 313 [1988]) the New York Court of Appeals rejected the argument that to require a utility to carry a competitor’s natural gas resulted in a physical invasion of RG&E’s distribution system, holding that to require a regulated utility to carry that which it has always carried does not amount to a taking inasmuch as the utility is not being forced to provide services beyond its original commitment, but is only being required to furnish services it has always provided. (See also, Matter of Pennsylvania Gas Co. v Public Serv. Commn., 225 NY 397 [1919], affd 252 US 23 [1920], supra; The Pipe Line Cases, 234 US 548 [1914]; Kansas City Power & Light Co. v State Corp. Commn., 238 Kan 842, 715 P2d 19 [1986], appeal dismissed 479 US 801 [1986] [wherein the court held that legislation mandating that electric utilities interconnect their facilities with those of private co-generators did not constitute a taking].)
Utilities are not entitled to deny the public, or competitors, access to facilities in public rights-of-way. (The Pipe Line Cases, 234 US 548, supra.) Nor do they have a property interest in customers or a right, statutorily or constitutionally, to a de facto monopoly. In MCI Telecommunications Corp. v Federal Communications Commn. (561 F2d 365, 380, cert denied 434 US 1040, supra), the court stated: "[t]he ultimate test of industry structure in the communications common carrier field must be the public interest, not the private financial interests of those who have until now enjoyed the fruits of de facto monopoly.”[9] (See also, Tennessee Power Co. v T.V.A., 306 US 118 [1939].)
*936 Courts have repeatedly confirmed that the PSC has broad discretion to select the means for achieving the Legislature’s goals of "just and reasonable rates” and economic, efficient service. (See, Matter of Consolidated Edison Co. v Public Serv. Commn., 47 NY2d 94 [1979], revd on other grounds 447 US 530 [1980], supra.) Further, the courts have recognized that to introduce "competition into a monopolistic marketplace and thus lower prices to consumers” is well within the Commission’s jurisdiction. (Matter of CNG Transmission Corp. v New York State Pub. Serv. Commn., 185 AD2d 671, 672.) And in Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn. (117 AD2d 156, 160 [3d Dept 1986]), the Third Department declared: "The use by an administrative agency of the evolutional approach is particularly fitting * * * Respondent has been delegated, by the Legislature, the difficult and sensitive responsibility of balancing the conflicting interests of the public and the utilities. In fulfilling that obligation, it cannot become stagnated but must adapt to the changing patterns in the industry, and rational responses by respondent should not be a target of judicial intervention.”
Electric service comprises three elements: generation, transmission and distribution. Opinion 96-12’s policy statement does not envision unregulated transmission and distribution rates, although the PSC clearly has the power to do so.
It is in the area of generation that the petitioners contest a future policy of regulatory forbearance. Section 65 (1) of the Public Service Law calls on the PSC to set "just and reasonable” rates for electric service. Petitioners suggest that the PSC may not allow market pressures to set rates for the generation component of electric service.
In Elizabethtown Gas Co. v Federal Energy Regulatory Commn. (10 F3d 866, 869 [DC 1993]), the court held FERC’s approval of market-based pricing was "just and reasonable” because, in part, FERC had emphasized that it would exercise its oversight powers to assure that a market rate was "just and reasonable”. This decision was consistent with the basic economic principle that "[i]n a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that price is close to marginal cost, such that the seller makes only a normal return on its investment.” (Tejas Power Corp. v Federal Energy Regulatory Commn., 908 F2d 998, 1004 [DC 1990].)
If and when the PSC lightens regulation of generation to accommodate competition, the justiciable issue will be whether *937 such action rationally advances the Legislature’s purpose of bringing customers "just and reasonable” electric service. That is the legislative standard, to be determined in particular cases by PSC expertise, subject to judicial review to guard against arbitrary and capricious decisions.
Opinion 96-12 encourages utilities to divest themselves of generation assets in order to facilitate the development of a competitive marketplace "not subject to the abuses of dominant market power” (Re Competitive Opportunities Regarding Elec. Serv. [Opinion & Order Regarding Competitive Opportunities for Elec. Serv.], cases 94-E-0952 et al., Opn No. 96-12, 168 PUR4th 515, 587, n 98, supra). It does not, however, in fact direct divestiture. Nevertheless petitioners petition the court for a declaration that the Commission lacks authority to do so. Though academic questions are not a proper subject for judicial review (Cuomo v Long Is. Light. Co., 71 NY2d 349, supra), it is meaningful to note that divestiture may be effected through exercise of powers inherent in the PSC’s discretion to set rates.[10]
Prometheus’ act of courage and beneficence in breaking the monopoly of the gods by giving electrical energy to mankind— and its terrible consequences to him — may not be demeaned by a mere transfer of that monopoly to the lords of industry, for the benefit only of some and not of all. It was a gift to mankind, not a gift to a favored few. If events ultimately demonstrate that utility ownership of generation facilities jeopardizes "just and reasonable” rates or "safe and adequate” services (Public Service Law §§ 65, 66; Matter of Public Serv. Commn. v Jamaica Water Supply Co., 42 NY2d 880 [1977]), it would appear the Commission may condition discretionary rate relief on asset divestiture.
OPINION 96-12 AND STRANDED COSTS* [11]
In Opinion 96-12 the Public Service Commission rejected a claim by the utility industry that rates, as a matter of law, must be designed to reimburse them for every dollar that the utilities may lose due to competition.
The electric utility industry repeatedly professed recognition that a competitive electric marketplace was inevitable and in the public interest; it, however, conditioned its cooperation on *938 an assurance that ratepayers would underwrite all stranded costs — in the context of this case, competitive losses. Having, as a matter of law, been denied that assurance, the utilities brought this petition denying a jurisdictional base for the other aspects of Opinion 96-12.
One of the arguments made by petitioners in support of their claims for total recovery of their stranded costs (as against the PSC decision, based on the law, to examine the recoverability of stranded costs on a case-by-case basis) is that they contracted with New York State to provide safe and reliable service in return for prudent cost recovery; that this constituted a "regulatory compact”; and that failure to guarantee full recovery of stranded costs constitutes a breach of contract. These arguments are contradicted by the Public Service Law and have repeatedly been rejected by the courts. (See, Public Service Law § 72; Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 212 [1986] [which has interpreted Public Service Law § 72 as empowering the PSC to deny utilities recovery of prudent costs]; Matter of Consolidated Edison Co. v New York State Pub. Serv. Commn., 53 AD2d 131, 133-134 [3d Dept 1976], lv denied 40 NY2d 803 [wherein the Court stated "(o)ther than the accomplishment of a just and reasonable result there is no requirement in law that any specific factors should be considered in fixing utility rates”].)
Since the turn of the century, electric utilities have been on notice that they are required to serve the public need for electricity, not in return for a particular ratemaking method, but in return for a variety of powers traditionally reserved to the sovereign, including eminent domain and the use of public rights-of-way. (Tismer v New York Edison Co., 228 NY 156, 161 [1920] ["the duty to serve would exist without the statute, for it results from the acceptance of the franchise of a public service corporation”]; see also, Matter of Pennsylvania Gas Co. v Public Serv. Commn., 225 NY 397, 406, supra.) If utilities fail to provide service, regardless of their rate levels, the PSC may take preventive, corrective or remedial action. (Public Service Law §§ 25, 65 [1]; § 72; Matter of Public Serv. Commn. v Jamaica Water Supply Co., 54 AD2d 10 [1976], affd 42 NY2d 880, supra.)
The basis of agency ratemaking authority has traveled a path from "fair value” of "used and useful” assets (see, Smyth v Ames, 169 US 466), this language giving way to "prudent investment” language, to specific valuation methods based on an "end-result test”, which enables agencies to use any rate- *939 making method of their choosing provided that the "end result” of the process is "just and reasonable” rates. (See, Power Commn. v Hope Gas Co., 320 US 591, 601-602 [1944].)
"Just and reasonable” rates do not necessarily guarantee utilities net revenues nor do they immunize utilities from the effects of competition. "The due process clause * * * has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces.” (Market St. Ry. Co. v Commn., 324 US 548, 567 [1945], reh denied 324 US 890 [1945].) "[Regulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future earnings”. (Power Commn. v Pipeline Co., 315 US 575, 590 [1942]; San Diego Land & Town Co. v Jasper, 189 US 439, 447 [1903]; see also, Covington & Lexington Turnpike Rd. Co. v Sandford, 164 US 578, 596 [1896] [wherein the court held that the public need not be subject to unreasonable rates so that stockholders may earn dividends; rather, in order to be "just and reasonable”, rates simply must reflect a fair balancing of ratepayer and shareholder interests].)
In Los Angeles Gas Corp. v Railroad Commn. (289 US 287, 306 [1933]), the Court wrote that "while cost must be considered, the Court has held that it is not an exclusive or final test. The public have not underwritten the investment.” And in Public Serv. Commn. v Utilities Co. (289 US 130, 135 [1933]), the Court expounded "[t]he loss of, or the failure to obtain, patronage, due to competition, does not justify the imposition of charges that are exorbitant and unjust to the public. The * * * Constitution * * * does not protect public utilities against such business hazards.”
The New York Public Service Commission generally has based rates on projections of prudent costs, but when necessary it has deviated from that procedure in order to avoid excessive or unreasonable rates. (See, Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 108 AD2d 35 [3d Dept 1985]; Matter of St. Lawrence Gas Co. v Public Serv. Commn., 42 NY2d 461 [1977] [wherein the Court confirmed a Commission decision denying a utility rate recovery of losses due to competition]; Central Hudson Gas & Elec. Corp. [Central Hudson], case 27032, Opn No. 77-6, 17 NY PSC 401, 408-409 [1977] [wherein the Commission denied a utility rate recovery of a portion of carrying charges on excess capacity that was prudently constructed]; Niagara Mohawk Corp., case 26943, Opn No. 76-23, 16 NY PSC 908, 923-930 [1976].)
*940 The law of ratemaking in New York State — indeed, throughout the United States, is well and thoroughly stated in Matter of Abrams v Public Serv. Commn. (67 NY2d 205, supra). The Court affirmed the findings of the PSC’s Administrative Law Judge and of the Appellate Division, Third Department (104 AD2d 135), and held that under the rule enunciated in Power Commn. v Hope Gas Co. (320 US 591, supra), the PSC was not obligated to use any particular formula or combination of formulae to determine rates and that in the instant case the PSC’s application of the "prudent investment” test was fair and reasonable under the circumstances. "Public Service Law § 72 empowers the PSC to consider all factors 'which in its judgment’ are relevant 'with due regard among other things to a reasonable average return upon capital actually expended’. The PSC is free to entertain or ignore any particular factor, or to assign whatever weight it deems appropriate * * * Section 72 mandates only that the rates fixed by the PSC be 'just and reasonable’ and, consequently, unless it is shown that the judgment of the PSC was exercised 'without any rational basis or without any reasonable support in the record’, its determination is not to be set aside”. (Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 212, supra.)
The rule of Smyth v Ames (169 US 466, supra) does not prevail today. "In 1942 in its decision in Power Commn. v Pipeline Co. (315 US 575), the Supreme Court overruled so much of Smyth v Ames as prescribed a requirement for valuation based on 'fair value’. The court held that '[t]he Constitution does not bind the ratemaking bodies to the service of any single formula or combination of formulas’ (id,., at p 586). Two years later, in the landmark decision of Power Commn. v Hope Gas Co. (320 US 591, supra), the court reaffirmed the rules stated in Power Commn. v Pipeline Co. (supra), and added that 'it is the result reached not the method employed which is controlling’ (id., at p 602). Unless shown to be 'unjust and unreasonable’, the rates are valid.” (Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 213, supra.)
"In New York, the courts and the PSC have availed themselves of the latitude afforded by Hope Gas Co. (supra) and have not insisted upon a rigid approach [cites omitted]”. "[Tjhere is no Federal proscription against the use of the 'prudent investment’ test * * * Of course, the New York Public Service Commission is not bound under Hope Gas Co. (supra) to use the 'prudent investment’ approach and, indeed, it has not always done so [cites omitted]. But if the end result is a *941 just and reasonable balancing of consumer and investor interests, the PSC may employ the 'prudent investment’ test or any other formula or combination of formulae without offending the Federal Constitution or decisional law.” (Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 214-215, supra)
When the wheat is separated from the cnaff, the one immutable rule of ratemaking comes down to this: Is the "end result” "just and reasonable” — and fair as between the utilities’ customers and their stockholders. That is a determination of the regulatory body, subject only to the prohibition against arbitrary and capricious decision making. The courts must otherwise defer to the expertise of the regulatory body!
PROCEDURAL CONSIDERATIONS UNDER THE STATE ADMINISTRATIVE PROCEDURE ACT RESPECTING OPINION 96-12
In addition to directing the utilities to file rate /restructuring plans by October 1, 1996 to further the parties’ analysis of how New York State can best make the transition to a competitive electric industry, and rejecting the claim of the utilities that they were entitled, as a matter of law, to rates based on every dollar of prudent investment regardless of customer impact, Opinion 96-12 further sets forth the Commission’s "policy” on how a competitive industry should be structured — not by direction but by vision.
Opinion 96-12 in no way restructures the electric industry. It reflects an expectation, not a direction, of utility action, and calls for the collaboration of the electrical energy industry to join the Commission in an exploration of a future blueprint for the industry in a competitive mode. (See, Matter of Roman Catholic Diocese v New York State Dept. of Health, 66 NY2d 948 [1985]; Matter of Abreu v Coughlin, 161 AD2d 844 [3d Dept 1990].) Section 102 (2) (b) (iv) of the State Administrative Procedure Act provides that nonbinding "statements of general policy” are not rules. State Administrative Procedure Act § 102 (2) (a), defining "rule”, talks in terms of the implementation or application of law.
"[0]nly a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers constitutes a rule or regulation required by NY Constitution, article IV, § 8 to be filed in the office of the Department of State.” (Matter of Roman Catholic Diocese v New York State Dept. of Health, 66 NY2d 948, 951, supra.)
The Commission’s rejection of the utilities’ claim to rates based on every dollar of stranded costs, regardless of rate *942 impact, simply restated well-established law. This was neither a "rule” nor a "policy” but the application of a binding principle of law, not within the concept of a State Administrative Procedure Act "rule”.
Neither was the Commission’s instruction to the utilities to file restructuring proposals a "rule”, but a continuing step in the collaborative process. If and when the Commission approves or rejects a plan, or orders restructuring in a certain manner, it will be promulgating a rule and must take appropriate action under the State Administrative Procedure Act. (See, Matter of New York City Tr. Auth. v New York State Dept. of Labor, 88 NY2d 225 [1996].)
The thought processes of the PSC in carrying out its duties cannot be placed in a straitjacket, lest it becomes rigid and ineffective.
SUMMARY AND CONCLUSION
After the in-depth analysis of the issues set forth in the court’s decision heretofore, it would serve a useful purpose to summarize said issues and the court’s conclusions respecting same. There is between the parties no dispute as to what these issues are; the only dispute is as to the court’s conclusions.
This lawsuit can be reduced to four questions. First, does the PSC have jurisdiction to require utilities to file plans outlining how they would adapt to a competitive electric industry? The answer is yes. Section 5 (2) of the Public Service Law empowers the PSC to direct such filings.
The second question is whether utilities, as a matter of law, are entitled to rates that are designed to recover all competitive losses, irrespective of the impact that such rates would have on consumers or a State’s economy. The courts have answered no. (Duquesne Light Co. v Barasch, 488 US 299 [1989]; Los Angeles Gas Corp. v Railroad Commn., 289 US 287, supra; Market St. Ry. Co. v Commn., 324 US 548, reh denied 324 US 890, supra; Matter of Abrams v Public Serv. Commn., 67 NY2d 205, supra; Matter of St. Lawrence Gas Co. v Public Serv. Commn., 42 NY2d 461, supra; Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 108 AD2d 35, 37, supra.)
The third question facing the court is whether a utility may challenge a policy statement that does not order the actions which the utility contests. The courts have held that judicial review is not appropriate when "the effect on plaintiff * * * is incomplete and undetermined.” (Church of St. Paul & St. *943 Andrew v Barwick, 67 NY2d 510, 522, cert denied 479 US 985, supra.)
Finally, has the PSC violated the State Administrative Procedure Act? Opinion 96-12 (1) instructs utilities to file plans, (2) states existing regulatory law respecting stranded costs, and (3) states the PSC’s policy on a competitive electric marketplace. It is not a rule under the State Administrative Procedure Act because section 102 (2) (b) (iv) of the State Administrative Procedure Act expressly exempts instructions and policy statements from the definition of a rule and a reaffirmation of regulatory law does not fall within the State Administrative Procedure Act’s definition of a rule.
Accordingly, the motion by petitioners to annul the Public Service Commission’s call for restructuring of the electric industry and ultimate transfer of same from monopoly to competition — as set forth in Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Regarding Competitive Opportunities for Elec. Serv.) (cases 94-E-0952 et al, Opn No. 96-12, 168 PUR4th 515, supra), and Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Deciding Petitions for Clarification and Rehearing) (cases 94-E-0952 et al, Opn No. 96-17, — PUR4th —, supra), is in all respects denied.

. Re Competitive Opportunities Available to Customers of Elec. & Gas Serv. (Order Instituting Phase II of Proceeding), case 93-M-0229, 154 PUR4th 35, 36-38 (1994).

. More formally the issues involved herein are embodied in Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Regarding Competitive Opportunities for Elec. Serv.) (cases 94-E-0952 et al., Opn No. 96-12, 168 PUR4th 515 [1996]) and Re Competitive Opportunities Regarding Elec. Serv. (Opinion & Order Deciding Petitions for Clarification & Rehearing) (cases 94-E-0952 et al., Opn No. 96-17, — PUR4th — [slip op, July 17, 1996]). The basic opinion for which judicial review is sought remains Opinion No. 96-12, and for ease of reference it will be that opinion which will be discussed here.

. Revenue shortfalls occasioned for diverse reasons.

. Once again, sübject to the rules prohibiting arbitrary and capricious actions.

. "Since the Legislature and not the PSC has, thus, chosen the end to be accomplished, has given the PSC broad discretion to choose the means of achieving the legislative objective, and the PSC’s choice of rate-making incentives for effective DSM energy conservation programs embodied in Opinion No. 89-29 clearly bears a reasonable relationship to the purpose of the enabling legislation [Public Service Law § 5 (2)], the challenge to the PSC determination withstands any objections based upon Boreali v Axelrod (supra)”. (Matter of Multiple Intervenors v Public Serv. Commn., supra, at 144.)

. It appears also that the PSC wants a brief period of wholesale wheeling before getting into retail wheeling.

. Under the essential facilities doctrine, a refusal to deal with a competitor is violative of antitrust laws if there is (1) control of the essential facility by a monopolist;'(2) a competitor’s inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. (See, MCI Communications Corp. v American Tel. & Tel. Co., 708 F2d 1081, 1132, 1133 [7th Cir 1983], cert denied 464 US 891 [1983].)

. Infra.

. Including a 60% differential between New York State rates and those throughout the rest of the Nation.

. Public Service Law § 72 expressly authorizes the PSC to condition rate increases on "such terms, conditions or safeguards as the commission may prescribe.”

. Revenue shortfalls.