OPINION OF THE COURT
Chief Judge Cooke.
We determine here whether the Public Service Commission exceeded its statutory authority or impinged upon First Amendment rights by restricting certain advertising and promotional practices of public utilities. For the reasons outlined, we hold that the Public Service Commission was within its authority in imposing the restrictions, and that petitioners’ expressional rights were not unconstitutionally impaired.
I
Respondent, New York Public Service Commission, exercises regulatory and supervisory powers over public utilities licensed to operate in the State (see Public Service Law, §§ 5, 66). In 1973 the commission, reacting to the Arab oil embargo, prohibited electric corporations "from promoting the use of electricity through the use of advertising, subsidy payments * * * or employee incentives”. Although the immediate crisis created by the embargo dissipated, no repeal of the promotional ban was effected by the commission. Then, in July of 1976, the commission issued a "Notice of Proposed Policy *101 Statement and Request for Comments on Advertising by Public Utilities and Electric Promotion Practices”. Petitioners, Central Hudson Gas & Electric Corporation and Consolidated Edison Company of New York, Inc., as well as other interested parties, responded to the notice, arguing for relaxation of the promotional ban on both policy and constitutional grounds.
After reviewing the comments received and conducting its evaluation of the problem, the commission rendered a decision on February 25, 1977 entitled "Statement of Policy on Advertising and Promotional Practices of Public Utilities”. In its statement, the commission concluded "that the existing ban on promotion of electricity sales should be continued”. Its reasoning for continuation of the prohibition was succinctly stated: "[Conservation of energy resources remains our highest priority * * * It is reasonable to believe that a continued proscription of promotion of electric sales will result in some dampening of unnecessary growth so that society’s total energy requirements will be somewhat lower than they would have been had electric utilities been allowed to promote sales.”
That same day, the commission released an order addressing the topic of utility bill inserts. By that order, the commission directed all utilities subject to its jurisdiction to "discontinue the practice of utilizing material inserted in bills rendered to customers as a mechanism for the dissemination of the utility’s position on controversial matters of public policy”. This restriction, too, was partially explained in the commission’s policy statement: "We believe that using bill inserts to proclaim a utility’s viewpoint on controversial issues * * * is tantamount to taking advantage of a captive audience, since the consumer cannot avoid receiving the utility’s message.”
Dissatisfied with the decision, Central Hudson and Con Edison petitioned for a rehearing, which was denied by the commission on July 14, 1977. Central Hudson then commenced an article 78 proceeding challenging the advertising and insert bans. Con Edison instituted a separate proceeding in which it objected to only the billing insert measure. Special Term, in brief opinions, ruled that while the commission had power to impose the promotional advertising restriction, it lacked authority to prohibit the use of bill inserts. On appeal, the Appellate Division modified, sustaining both branches of the commission’s determination.
*102 II
At the outset, petitioners challenge the commission’s statutory authority to regulate the content of billing envelopes and the promotional advertising practices of public utilities. It is, of course, a fundamental postulate of administrative law that the Public Service Commission, like other agencies, is possessed of only those powers expressly delegated by the Legislature, together with those powers required by necessary implication (see, e.g., Suffolk County Bldrs. Assn. v County of Suffolk, 46 NY2d 613; Matter of National Merchandising Corp. v Public Serv. Comm. of State of N. Y., 5 NY2d 485, 489; cf. Matter of Bates v Toia, 45 NY2d 460, 464). Nevertheless, the absence of explicit statutory authorization need not be fatal to a given assertion of regulatory power by the commission. For, as we have recognized previously, the Legislature on occasion broadly declares its will, specifying only the goals to be achieved and policies to be promoted, while leaving the implementation of a program to be worked out by an administrative body (see, e.g., Matter of Sullivan County Harness Racing Assn. v Glasser, 30 NY2d 269, 276; cf. Matter of Bates v Toia, supra). In such cases, the sheer breadth of delegated authority precludes a precise demarcation of the line beyond which the agency may not tread. What is called for, rather, is a realistic appraisal of the particular situation to determine whether the administrative action reasonably promotes or transgresses the pronounced legislative judgment (cf. Matter of Broidrick v Lindsay, 39 NY2d 641, 646).
In the context of this case, without doubt, the Legislature has conferred vast power upon the Public Service Commission (see, e.g., Public Service Law, §§ 4, 5, 65, 66; cf. Matter of Public Serv. Comm. of State of N. Y. v Jamaica Water Supply Co., 42 NY2d 880, affg 54 AD2d 10). Indeed, the commission is expressly endowed with "all powers necessary or proper to enable it to carry out the purposes of’ the Public Service Law (Public Service Law, § 4, subd 1). Added to this is the commission’s specific power of "general supervision of all gas corporations and electric corporations” and "all gas plants and electric plants” (Public Service Law, § 66, subd 1).
In light of current exigencies, one of the policies of any public service legislation must be the conservation of our vital and irreplaceable resources. The Legislature has but recently imposed upon the commission a duty to "encourage all persons and corporations * * * to formulate and carry out long- *103 range programs * * * [for] the preservation of environmental values and the conservation of natural resources” (Public Service Law, § 5, subd 2). Implicit in this amendment is a legislative recognition of the serious situation which confronts our State and Nation. More important, conservation of resources has become an avowed legislative policy embodied in the commission’s enabling act (see, also, Matter of New York State Council of Retail Merchants v Public Serv. Comm. of State of N. Y., 45 NY2d 661, 673-674).
It necessarily follows, therefore, that the commission possesses ample power to prescribe reasonable measures designed to prevent wasteful consumption or unneeded expansion of utility services. By prohibiting promotional advertising of electric power, the commission has taken precisely such a step. In its expertise, the commission could have reasonably concluded that promotional advertising might tend to increase injudicious and unnecessary consumption of electrical power. Given this, the authority for the advertising ban becomes apparent.
Nor did the commission exceed its jurisdiction by prohibiting the inclusion of inserts in utility billing envelopes. The Legislature has granted the' commission express authority "to fix and alter the format and informational requirements of bills utilized by public and private gas corporations, electric corporations and gas and electric corporations in levying charges for service, to assure simplicity and clarity” (Public Service Law, § 66, subd 12-a).[1] Incident to that authority and in the same subdivision it is provided that the "commission shall further ensure periodic explanation of applicable rates and rate schedules for the purpose of assisting customers in making the most efficient use of energy”. Thus, the Legislature has authorized the commission to regulate not only the format and informational content of the bill itself but the entire billing communication. Petitioners invite us to read these provisions narrowly, restricting the commission’s jurisdiction to the actual billing instrument itself rather than extending it to the entire contents of the billing envelope. This *104 artificial distinction must be rejected. By necessary implication, the statute, if it is to amount to more than an empty adage, must provide the commission with authority to oversee the distribution of bill inserts. Were the agency’s power construed to extend only to the bill itself, control over informational content and format "to assure simplicity and clarity” could be severely hampered if not totally undermined. While the bill might be simple and clear, utilities could literally inundate consumers with a morass of irrelevant and conflicting data, forms, and pamphlets, causing confusion and oversight. Indeed, granting the utilities unfettered discretion to include all materials would negate the legislative goals of simplicity and clarity. It is difficult to conceive a legislative intent to permit such a disordered pattern. A more acceptable alternative is an interpretation of the statute empowering the commission to regulate the billing process as a whole.
This construction becomes all the more reasonable when viewed in the context of the entire regulatory scheme. Rather than restricting the PSC’s authority, the Legislature has invested that agency with all powers needed to carry out the purposes of the Public Service Law, as well as power to supervise generally the operation of electric and gas corporations and electric and gas plants (Public Service Law, § 4, subd 1; § 66, subd 1). In view of the expansive definitions of electric and gas plants (Public Service Law, § 2, subds 10, 12), the commission’s supervisory authority must be taken to extend to those "useful and necessary service[s] [and property] which facilitate” or are used in connection with the "manufacture, conveying, transportation, distribution, sale, or furnishing” of utility power (Matter of National Merchandising Corp. v Public Serv. Comm., 5 NY2d 485, 490-491, supra; Public Service Law, § 2, subds 10, 12). Control of the billing procedure, a process necessarily adjunct to the furnishing of utility service, thus fits neatly into the PSC’s supervisory role. This supervisory power, combined with the more specific billing regulatory authority, provides ample justification for commis^ sion oversight of billing envelope content.
To summarize, the Public Service Commission is possessed of sufficient statutory power to prohibit the promotional advertising of electricity and to prescribe the content of electric and gas corporation consumer billing envelopes.
III
The commission’s actions being within the limits of its *105 delegated authority, petitioner’s First Amendment contentions must be addressed. The constitutional attack is directed at both the outright prohibition of promotional advertising and the ban on bill enclosures dealing with controversial topics.
Analysis in the First Amendment area proceeds on one of two tiers, depending upon the nature of the restriction which government has imposed (see, e.g., Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv L Rev 1482). At one level, government regulation designed to suppress traditional communicative activity because of its content or potential impact is subject to the most rigorous scrutiny. Absent some compelling justification, such as a likelihood that speech will incite "imminent lawless action”, content-oriented restrictions may not stand (Brandenburg v Ohio, 395 US 444, 447; see Hess v Indiana, 414 US 105; United States v O’Brien, 391 US 367, 376-377; see, generally, Gunther, Learned Hand and the Origins of Modern First Amendment Doctrine: Some Fragments of History, 27 Stan L Rev 719). On the second tier are those governmental measures which, although not directly aimed at all communication, inhibit the free flow of information or ideas. The validity of such a restraint is gauged by balancing the various competing interests, with due regard for the status of First Amendment rights in our constitutional scheme. Thus, so long as a facially neutral regulation does not unduly constrict the exercise of protected rights, it is not unconstitutional (compare Buckley v Valeo, 424 US 1, 60-84, with Schneider v State, 308 US 147; see, generally, Note, Less Drastic Means and the First Amendment, 78 Yale U 464).
A
In the present case, the prohibition on billing inserts, which was designed to vindicate the privacy rights of utility customers, constitutes at best an indirect restraint upon ex-pressional activity. It extends not to all speech of a prescribed content, but only to one manner of communication. No one viewpoint is singled out for special treatment, nor is the general right to express ideas in other forums effected. In short, the PSC is concerned with but one particular means of expression, and then only to a limited extent.
 It is well settled that government may impose reasonable restrictions upon the time, place and manner of commu *106 nication (see, e.g., Grayned v City of Rockford, 408 US 104, 115-117; Kovacs v Cooper, 336 US 77; Cox v New Hampshire, 312 US 569, 575). To constitute a valid time, place and manner restriction, a regulation must be content neutral, supported by a significant governmental interest, and not foreclose alternative channels of expression (e.g., Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 771). Respondent PSC urges that its billing insert decree satisfies these criteria. It is correct.
There is no doubt but that the regulation leaves open numerous alternative means of communication. On its face, the ban only reaches expressional activity conducted through the billing envelope. Whatever other modes of speech were open to utilities prior to the effective date of the commission order remain available. That the cost of utilizing these alternative channels may be higher is not determinative, especially where, as here, petitioner has wholly failed to demonstrate that it will be effectively precluded from exercising its rights (see, e.g., Kovacs v Cooper, 336 US 77, 88-89, supra).
In a similar vein, the ban unquestionably fosters an important governmental interest. Consumers of utility services, like many others in captive situations, have no choice concerning receipt of a periodic statement from the power company. Whatever materials are enclosed in the envelope are destined to come in contact with the addressee. When the insert espouses the utility’s viewpoint on a controversial question, it is as likely to offend the sensibilities of the recipient as it is to elicit agreement. Government need not stand idly by and deny assistance to those who are inflamed by having a particular opinion foisted upon them. "Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit; we see no basis for according the printed word * * * a different or more preferred status because [it is] sent by mail. The ancient concept that 'a man’s home is his castle’ into which 'not even the king may enter’ has lost none of its vitality, and none of the recognized exceptions includes any right to communicate offensively with another” (Rowan v Post Off. Dept., 397 US 728, 737; see, also, Martin v Struthers, 319 US 141; Black, He Cannot Choose But Hear: The Plight of the Captive Auditor, 53 Col L Rev 960). A governmental agency such as the PSC may take appropriate steps to protect this privacy right of its constituents (Kovacs v Cooper, supra, at pp 86-89; Cohen v California, 403 US 15, 21-22; see, also, *107 Public Utilities Comm. v Pollak, 343 US 451, 466-469 [Douglas, J., dissenting]).
Finally, the regulation, properly viewed, is not content oriented. True, the directive sweeps within its strictures only those bill inserts treating controversial topics. But it does not discriminate against persons of any particular political stripe or prohibit the expression of any one position on a hotly debated issue. In short, the restriction endeavors, in an objective and evenhanded manner, to limit billing insert materials to the innocuous and noncontroversial. Given these circumstances, where the communication intrudes upon the privacy of the home, such a limitation does not offend the First Amendment (Erznoznik v City of Jacksonville, 422 US 205, 209; see Greer v Spock, 424 US 828, 838-839; Lehman v City of Shaker Hgts., 418 US 298, 302-304; see, Tribe, American Constitutional Law, § 12-21, at pp 690-691, & n 21).
Accordingly, because it satisfies the above criteria, the PSC order banning bill inserts constitutes a valid time, place and manner regulation.
B
To be contrasted is the commission directive proscribing all promotional advertising of electric service. Rather than an oblique inhibition, this order works a direct curtailment of expressional activity: an entire category of speech is prohibited because of its potential impact upon the society. As noted, content-oriented regulations have been subjected to an exacting standard of review, the precise level of that standard being determined by reference to the nature of the communication.
Until recently, communication in the commercial sphere would not have been accorded any First Amendment recognition (compare Valentine v Chrestensen, 316 US 52, with Bigelow v Virginia, 421 US 809). While now entitled to a measure of constitutional protection, the full panoply of safeguards afforded more traditional communications does not necessarily attach (Ohralik v Ohio State Bar Assn., 436 US 447, 456). Our task, therefore, is to apply the emerging principles of the commercial speech doctrine to the present context.
A common theme sounding in commercial speech cases is the notion that society, as a whole, "may have a strong interest in the free flow of commercial information” (Virginia *108 Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 764, 765; see, e.g., Linmark Assoc. v Willingboro, 431 US 85, 92; Bates v State Bar of Ariz., 433 US 350, 364-365). In a market system such as ours, allocation of resources is largely accomplished through a confluence of private economic decisions. Society possesses a vital interest in ensuring that these economic decisions are consummated in an intelligent, well-informed atmosphere, and the free flow of commercial information is indispensable to the attainment of this goal (e.g., Virginia Pharmacy Bd. v Virginia Consumer Council, supra, at p 765).
The individual consumer, too, has a stake in the availability of commercial information. To many, knowledge of the price and availability of goods and services takes on an importance overshadowing even the most urgent political debate. Especially in these days of rapidly fluctuating prices, the free flow of commercial information plays a central role in consumer decisionmaking. Indeed, it could mean the difference between enjoyment or nonenjoyment of basic necessities (see Virginia Pharmacy Bd. v Virginia Consumer Council, supra, at p 764).
Recognition of these interests accounts, in large measure, for the protections extended commercial speech. In a competitive market, information concerning the availability and price of goods and services is essential to consumers. Analysis of precedent bears out this observation. In Virginia Pharmacy Bd. v Virginia Consumer Council (425 US 748, supra), for example, the State sought to prohibit advertising of prescription drug prices. Acknowledging the State’s strong interest in ensuring the professionalism of pharmacists, the Supreme Court nonetheless found the societal and individual benefits flowing from price advertising in this competitive industry to be superordinate: "Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways. * * * But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering” (id., at p 770). Similarly, in Bates v State Bar of Ariz. (433 US 350, supra), a disciplinary rule restricting advertising by attorneys was invalidated. In so doing, the court again highlighted the role of commercial information in a free enterprise economy, commenting that "such speech serves individual and societal interests in assuring informed and reliable decisionmaking” (id., at p 364). The various justifica *109 tions offered in support of a ban on attorney advertising were deemed insufficient to override these interests (id., at pp 366-379).
By the same token, where the importance of the free flow of commercial information is diminished, either because of market structure of the industry or hazards associated with a particular means of communication, First Amendment protection reaches its nadir.[2] This dichotomy is aptly illustrated by Ohralik v Ohio State Bar Assn. (436 US 447, supra), where a prohibition of in-person solicitation by attorneys was upheld. Ohralik recognizes the " 'common-sense’ distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.” For this reason, commercial speech occupies a "subordinate position in the scale of First Amendment values” (id., at p 456). Thus, a particular mode of advertising which would not well serve the societal interest in informed decisionmaking, such as in-person solicitation, may constitutionally be banned: "In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the 'availability, nature, and prices’ of legal services * * * it actually may disserve the individual and societal interest * * * in facilitating 'informed and reliable decisionmaking’ ” (id., at pp 457-458). Such speech, Ohralik teaches, may be prohibited in the public interest.
Applying these principles, the ban on promotional advertising of electricity is consistent with First Amendment strictures. Public utilities, from the earliest days in this State, have been regulated and franchised to serve the commonweal. Our policy is "to withdraw the unrestricted right of competition between corporations occupying * * * the public streets * * * and supplying the public with their products or utilities which are well nigh necessities” (People ex rel. New York Edison Co. v Willcox, 207 NY 86, 99; Matter of New York Elec. Lines Co., 201 NY 321). The realities of the situation all but dictate that a utility be granted monopoly status (see People ex rel. New York Elec. Lines Co. v Squire, 107 NY 593, 603-605). To protect against abuse of this superior economic *110 position, extensive governmental regulation has been deemed a necessary co-ordinate (see People ex rel. New York Edison Co. v Willcox, supra, at pp 93-94).
In view of the noncompetitive market in which electric corporations operate, it is difficult to discern how the promotional advertising of electricity might contribute to society’s interest in "informed and reliable” economic decisionmaking. Consumers have no choice regarding the source of their electric power; the price of electricity simply may not be reduced by competitive shopping. At best consumers may seek, through the Public Service Commission, to limit future increases in electrical prices. Surely promotional advertising would provide no information of assistance in this respect.
Indeed, promotional advertising is not at all concerned with furnishing information as to the "availability, nature, and prices” of electrical service. It seeks, instead, to encourage the increased consumption of electricity, whether during peak hours or oif-peak hours. Thus, not only does such communication lack any beneficial informative content, but it may be affirmatively detrimental to the society. It would not strain the bounds of judicial notice for us to take cognizance of the present energy crisis. Conserving diminishing resources is a matter of vital State concern and increased use of electrical energy is inimical to our interests. Promotional advertising, if permitted, would only serve to exacerbate the crisis. In short, this constitutes a compelling justification for the ban.
Accordingly, the order of the Appellate Division in each case should be affirmed, with costs.
Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur with Chief Judge Cooke.
In each case: Order affirmed.

. Added by chapter 527 of the Laws of 1977, approved August 1, 1977. In a case such as this one, we have no difficulty in applying the principle that we must decide the case on the basis of the law as it exists today. (Strauss v University of State of N. Y., 2 NY2d 464, 465.) It would be but a futile exercise to annul the PSC determination on the basis of prior law only to have the agency validly repromulgate its order under the recent amendment.

. We are not suggesting that the fate of a business entity’s First Amendment rights turns upon its economic self-interest (see First Nat. Bank of Boston v Bellotti, 435 US 765). To the contrary, petitioners’ economic interest would be well served by promotional advertising. Rather, it is the beneficial or detrimental impact of commercial information upon society which assumes importance on analysis.