OPINION OF THE COURT
Robert F. Julian, J.
Relief Requested
Plaintiffs seek judgment providing for the demolition of a burned, unsalvageable building; compensation for the costs thereof; and an injunction restraining the expenditure of insurance proceeds derived from the fire. Defendant seeks a judgment holding it does not owe the cost of demolition.
Holding
Judgment granted to plaintiffs, County of Oneida and City of Utica. The court finds:
(1) Defendant is liable for the cost of demolition. An inquest shall be held to determine the amount owed. The defendant is enjoined from expending $15,000 of the fire insurance proceeds collected pending determination of the amount owing for demolition.
(2) A contract implied in law between the City and the defendant by which the City would demolish defendant’s structure at no cost to the defendant is void because the contract bestows an unconstitutional gift of services upon the defendant. The City cannot demolish private property and not charge the owner (defendant) for the cost of its services because a failure *691 to charge is an unconstitutional gift in violation of article VIII, § 1 of the New York Constitution.
(3) There was no contract between the parties that released the defendant from responsibility for the cost of demolition because there was no meeting of the minds, no consideration, and certain provisions of the proposed contracts violate New York Constitution, article VIII, § 1.
(4) To satisfy the gifts and loans provision of New York Constitution, article VIII, § 1, the City and County must attempt to collect the cost of demolition from the property owner personally and cannot solely resort to a special assessment pursuant to section 20 (35) of the General City Law against the property for repayment where the cost of demolition exceeds the value of the property.
(5) The common practice engaged in for years by the City and County that permitted a property in long-standing codes noncompliance to be taken for unpaid real estate taxes and then demolished at taxpayers’ expense is an abuse of discretion and violative of article VIII, § 1 of the New York Constitution. The court takes judicial notice that there are a significant number of properties in the City significantly out of codes compliance that fall within this category.
Discussion
Procedural Status
The County of Oneida (County) commenced this action against the Estate of John Kennedy et al. (the Estate) the owners) of certain fire-damaged property at 603 Saratoga Street, Utica, New York, on May 23, 2001, seeking a judgment ordering the demolition of the property and payment therefor by the owner(s). The Estate commenced a third-party action against R.E.B. Enterprises, Inc. (REB) and Ron Borek (apparently a principal in REB) and the City of Utica (City). There has been no appearance by REB, and it is unknown to the court whether or not REB has been served; the court finds that it has no jurisdiction over REB and makes no findings or rulings regarding it. The City was granted permission to intervene in this case as a plaintiff at a hearing before the court on July 23, 2001 without opposition by either party. Although discussion at that time indicated the City was intervening as a defendant, that was clarified at the continued hearing on July 27, 2001. The City intervenes as a plaintiff and has adopted the complaint of the County as its pleading. The County’s complaint is ordered deemed to be the complaint of the City, and *692 the answer and other pleadings are deemed, and ordered, amended accordingly. This also has been stipulated to by the parties. The amended pleadings are in the court’s file.
In the verified complaint the County and City further request injunctive relief freezing the funds obtained or to be obtained from fire insurance by the Estate or its decedent.
The County is proceeding pursuant to the Public Health Law and the County Sanitary Code and the City seeks relief pursuant to the City Housing Standards Code. The Estate and its individual defendants seek a dismissal of the complaint, and as further discussed below the enforcement of an alleged contract to demolish the property, and judgment on their counterclaim against the City for the cost of demolition.
The Estate did not dispute that the property should be demolished nor did it oppose the demolition of the premises. The court, with the consent of the parties on July 23, 2001, issued an order and judgment compelling demolition of the premises. The building was demolished by the County of Oneida in August of 2001 pursuant to that order. The defendant disputes the plaintiff municipalities’ contention that the Estate is responsible for the cost of demolition. The Estate asserts, as defenses to this action:
(1) A third party, REB, had a contract with the Estate to demolish the property and breached that contract. REB is not before the court, and thus the court is not empowered to rule in any way upon this claim except to find it not material or relevant to this proceeding. Any third-party action in existence is deemed, and ordered, severed on the court’s own motion.
(2) There was either an oral or a written agreement or a contract implied in law between the Estate and the City which provided that the Estate would not be held responsible for paying any costs of demolition. Two written forms of agreement were prepared, but neither was ever executed by any authorized representative of the City. The defendant in its verified answer, and at trial, alleged the existence of the oral contract with the City. The Estate asserted at trial the existence of a written agreement signed by the executrix only.
(3) The defendant’s failure to demolish this building or to act to enforce its contract with REB at a reduced price was based upon the plaintiff City’s promise to demolish it, thus creating a contract implied in law between the City and defendant, as the defendant relied upon the City’s promise to its detriment.
(4) The property was lost for back taxes, and thus, the Estate is not a proper party as it does not have title. The record does *693 not support this assertion and this defense is dismissed and not further considered.
(5) The defendant is being unfairly singled out by the plaintiffs and thus is the victim of selective enforcement.
Facts
The property in issue, 603 Saratoga Street, was severely damaged in a fire on December 15, 1997 and was deemed irreparable. The building was insured and the fire insurance carrier paid the Estate’s decedent in excess of $40,000 within several months of the fire. Those funds remain in the Estate’s savings account.
The court took proof on July 23, July 27, August 7, and August 13, 2001.
The attorneys appearing for both the City and Estate testified, and by stipulation of all parties, conflicts on this basis were expressly waived.
Two purported written contracts were introduced into evidence. The first (Contract One) was a proposed, unsigned contract prepared by the City and presented to the Estate in the spring of 2000. It provided that the City may seek restitution for demolition costs. Contract One also permits the City, in the alternative, to file a lien against the property for the demolition costs. The second contract (Contract Two) was prepared by the Estate and is a modification of the City’s proposed Contract One and was signed by the executrix only. The modification eliminated any requirement that the property owner pay for the demolition, but did provide for the filing of a special assessment pursuant to the General City Law for the cost of demolition. This contract was sent to the City with the signature of the executrix but was never acted on by any City body or official and remained unsigned.
The Assistant City Corporation Counsel who negotiated the contracts testified that a final demolition agreement was not entered into between the City and the Estate either in writing or orally. The executrix in her testimony did not dispute this contention and testified that she was unaware of any final agreement with the City to demolish the property. The Assistant Corporation Counsel further testified that, while the City had previously entered into a number of agreements utilizing Contract One, he had advised the attorneys for the Estate that the City of Utica had not perfected either a personal judgment against any owner who had made, or a special assessment against any property that was the subject of, such an *694 agreement. Moreover, he advised the Estate that he was unaware of any proceeding wherein the City of Utica had pursued either a personal judgment against the offending property owner or a special assessment against the property. The Assistant Corporation Counsel acknowledged that his purpose in discussing with the Estate’s representative the City’s past practice of not acting to collect costs of demolition from private individuals was to induce the Estate to enter into an agreement. The attorney for the Estate confirmed that this conversation occurred and testified that he relied upon the conversation as a basis for his assertion that there was an oral contract or a contract implied in law. Moreover the executrix testified that the Estate did not act to demolish the house because the Estate believed that the City had agreed to demolish it and not charge the Estate.
The attorney for the Estate testified, in what the court finds to be a conclusory manner, that Contract Two was accepted, or that there was an oral contract or that there was a contract implied in law. The Estate’s attorney did not specify any communication of an acceptance by the City of Contract Two or any evidence of a meeting of the minds regarding an oral contract. He acknowledged that the Estate had rejected Contract One. Without citing specific facts regarding the acceptance or meeting of the minds, the attorney for the Estate testified that he thought both oral and written agreements with the City provided that the City would demolish the building and not charge the Estate. When pressed by the court, he could point to no specific written or oral acceptance of either written contract or the alleged oral contract by any employee of the City, much less an authorized agent or body of the City. The executrix of the Estate and the attorney for the Estate testified that, based upon the totality of their discussions with the City, they did not expect the Estate to be charged for the demolition. The attorney for the Estate testified that when he had asked the Assistant Corporation Counsel for the status of Contract Two he was not able to obtain a specific answer. When the attorney for the Estate was asked if there was any act that he could point to that indicated an acceptance by the City, he testified, “it just went into limbo and that maybe they lost their steam taking all these buildings down.”
The attorney for the Estate and the executrix each testified that the Estate expected the City to take the building down at no cost to the Estate based on the discussions between the parties. The County estimated the cost to demolish this prop *695 erty to be $18,000. The Estate claims it did not act to enforce a contract with REB contractors to demolish the property for $7,100 because of the alleged promise made by the City to demolish this property for free. REB had gutted the property after having been paid $3,500, but never completed the demolition. Since the estimated cost of the County’s demolition exceeds this contract by $10,900, the defendant asserted that detrimental reliance and equity created a contract implied in law.
I. There is No Enforceable Contract or Contract Implied in Law
The court finds that no contract was formed between the parties.
“A contract is simply a promise supported by consideration (Curtis Props. Corp. v Greif Cos., 212 AD2d 259, 264), which arises, in the normal course of events, When the terms of an offer are accepted by the party to whom it is extended (see, Calamari and Perillo, Contracts § 11, at 13).” (Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp., 252 AD2d 376, 377 [1st Dept 1998]; see also Anderson, v Strong Mem. Hosp., 151 Misc 2d 353, 359 [Sup Ct, Monroe County 1991] [referencing “the three dimensions of contract law, offer, acceptance and consideration”].)
The court further finds that while the defendant does make a prima facie case for a contract implied in law, the same is not enforceable because it violates the New York Constitution.
A. There is No Acceptance or Consideration
There is no evidence in the record of the acceptance of either written form of contract by both parties. Neither the City nor the Estate or its decedent executed Contract One. Contract Two is signed by the executrix of the Estate, but there is no proof in the record of any acceptance by the City. Additionally, there is no proof of any consideration for this contract flowing to the City. There is no proof of any benefit the City would receive from any of the alleged contracts; it would only assume the defendant’s burden. The defendant agreed to do nothing of value for the City, with the possible exception of allowing the City onto land to do the Estate the favor of demolishing a structure that violates codes and is worse than worthless. The executrix testified that she believed she had already lost this property for taxes and acknowledged that this property was nothing but a burden to the Estate. To the extent the Estate even claims to have agreed to do anything, it was limited to agreeing to accept a benefit.
*696 With respect to the claim of oral contract, there was no proof that any authorized agent of the City entered into an agreement with the Estate or the individuals associated therewith. There was no proof of any transaction between the parties that constituted a meeting of the minds and mutual promises supported by consideration.
B. The Putative Written Contracts and the Claimed Contract Implied in Law, as Well as the Alleged Oral Contract are Unconstitutional
The defendant’s claim that there was a contract implied in law fails because the claimed implied contract violates article VIII, § 1 of the New York Constitution. Moreover, assuming, arguendo, there were the necessary elements to find the existence of a contract between the City and the Estate, and there are not, the court is nevertheless compelled by the significant public policy considerations at stake to comment at length on the constitutional issue. It is certain that this issue will arise again, given the consistent pattern of the City and the County failing to impose any burden on the owners of distressed properties for the cost of demolition. Nor does it appear that the City has considered whether or not putative contracts for cost-free demolition on private property would, in any event, be void because said contracts violate article VIII, § 1 of the New York Constitution, which provides, inter alia:
“No county, city, town, village or school district shall give or loan any money or property to or in aid of any individual, or private corporation or association, or private undertaking, or become directly or indirectly the owner of stock in, or bonds of, any private corporation or association; nor shall any county, city, town, village or school district give or loan its credit to or in aid of any individual, or public or private corporation or association, or private undertaking.”
i. Contract Implied in Law
The defendant asserts the existence of a contract implied in law. In 1998 the defendant entered into a contract with REB to demolish this property for the amount of $7,500. REB commenced work, stripped the interior of the building, but did not demolish it. The defendant contends, based on discussions with the City’s representatives, that the City would demolish the *697 property at no cost to the defendant and therefore the defendant did not act to enforce its contract with REB, which as mentioned previously, was substantially less expensive than the projected cost for the demolition of this building by the City or County. “A person can sue under a theory of quasi-contract as a contract implied at law, which is not a contract at all but an obligation implied by law to do justice even though it is clear that no promise was ever made or intended.” (22A NY Jur 2d, Contracts at 225.)
Normally, before determining the constitutionality of such a contract, the court would determine whether or not such a contract implied in law exists. The court is compelled to approach this situation somewhat differently. The court finds that the defendant made a prima facie case for a contract implied in law. There are many complex considerations concerning whether, given the prima facie showing, any implied promise is in fact enforceable under basic contract law. In this case, however, it is much clearer to the court that the underlying premise of such an implied contract is illegal than that there actually was, or wasn’t, a contract. The putative contract implied in law is illegal and thus void and unenforceable because it would unequivocally violate the above-cited gifts and loans section of the New York Constitution, article VIII, § 1.
It is well settled that when a local government “in the proper exercise of its delegated powers, summarily abates a public nuisance, it may compel the owner of the property involved to bear the cost.” (Lane v Mount Vernon, 38 NY2d 344, 349; Gregory v City of New York, 40 NY 273; City of Buffalo v Dankner, 48 AD2d 572, appeal dismissed 38 NY2d 826; 6A McQuillin, Municipal Corporations § 24.79; 1960 Opns St Comp No. 60-145.)
Thus, while the City may act as set forth above, it may not give away its services or funds to benefit a private party. That the City is constitutionally prohibited from giving a gift of public funds and public services is well settled. The demolition in this case was not based on any obligation owed by the City to the defendant. Consequently, for the City to do so at no cost to the defendant would be an unconstitutional gift. Quite to the contrary, it was the defendant which owed the City and County the obligation to either demolish or rehabilitate this property which, after the fire, violated the City Building Code and the Public Health Law. (City of Buffalo v Dankner, 48 AD2d 572 [4th Dept], appeal dismissed 38 NY2d 826.) In Angelone v City *698 of Rochester (72 AD2d 445, 449 [4th Dept]), for example, the Court had previously held a real property tax scheme enacted by the City of Rochester unconstitutional. In response to that ruling, the City passed an ordinance refunding the illegally collected taxes to all present real property taxpayers and not specifically to those taxpayers who actually paid the tax. This prompted yet another taxpayer challenge in which the Fourth Department held that the refund ordinance granted unconstitutional gifts of public monies to those who did not actually pay the tax, in violation of article VIII, § 1 of the New York Constitution. The purported contract implied in law in the case at bar is comparable with the ordinance in Angelone v Rochester (supra). While the Estate may have detrimentally altered its position, it was not owed any duty by the City. Thus the underlying premise of the contract implied in law in the instant matter is an illegal gift by the City of the services of demolition to the Estate rather than the satisfaction of a duty.
Although there is further discussion of this issue later in this decision, the court notes that the City’s past practice of assuming the cost of demolition for property taken for nonpayment of real estate taxes likely created an environment in which the Estate assumed that the City was obligated to demolish, at its own expense, the Estate’s structure. The executrix both in testimony and demeanor made it clear to the court that she expected the City to demolish this property either before or after a foreclosure for nonpayment of taxes. It is for that reason that the court in Point II. D. below examines that practice and points out that it is illegal as it also violates article VIII, § 1 of the New York Constitution and is born out of an abuse of discretion by the City and County in failing to enforce the law.
ii. Contract One
An analysis of each of the other contractual theories is necessary to dispose of the defendant’s claim of entitlement to contractual enforcement by the court.
Two clauses of Contract One violate the gifts and loans provision of the State Constitution. It is undisputed that when this contract was tendered the City Assistant Corporation Counsel told the Estate that the City virtually never sought personal reimbursement for demolitions performed by the City on private property. An affidavit submitted by the Assistant Corporation Counsel confirms that in the last five years the City has only twice taken judgments for reimbursement for demolitions.
*699 The first clause that is violative of the Constitution conditionally provided that the City may seek reimbursement for any demolition performed. Article VIII, § 1 of the New York Constitution mandates such a charge in any case in which a privately owned structure is demolished with public funds or personnel.
The second clause which is unconstitutional allows the City to charge the cost of demolition as a special assessment against the property. The Court of Appeals has held that a city may constitutionally utilize section 20 (35) of the General City Law, which permits a city, pursuant to a duly enacted ordinance and upon proper notice, to demolish or repair a nuisance and impose a special assessment charge against the property. (Lane v City of Mount Vernon, 38 NY2d 344, 349.) While utilizing such a special hen has generally been found to be constitutional, but to satisfy article VIII, § 1 of the New York Constitution givep the facts not only in this case but in most comparable demolition situations, the land liened upon must have a value that would permit the City to recover its costs. Thus the City is obligated to proceed against the property owner personally for demolition costs if the land is not of sufficient value to reimburse for the cost of demolition. The land in this case was worth less than one tenth of the cost of demolition. Indeed,- the personal representative of the defendant acknowledged the minimal value of the land:
“Q. John Kennedy was your father; is that correct?
“A. That’s correct.
“Q. Did your father own property on Saratoga St.?
“A. Yes, sir.
“Q. And can you give us the addresses of the different properties he owned?
“A. Technically I think the two houses had split addresses of 603 and 605 Saratoga St. and 607 and 609 Saratoga St.
“Q. And the estate still owns the home — so-called homestead, is that right?
“A. I believe so. I — as far as I know we still own it. The insurance after the fire—
“Q. I’m not talking about the damaged property. I’m talking about the property—
“A. Oh, the 607-609, yes, sir.
“Q. Estate owns that and its on the market for sale?
“A. That’s correct.
“Q. You can’t give it away basically, right?
“A. True.” (Transcript at 7.)
*700 This property had been in tax arrears for several years after the fire. Thus, at all times after the fire it was clear that there was no foreseeable, likely, or even plausible chance that the City could recoup the cost of demolition and the back taxes. Indeed, the undisputed proof is that postdemolition the lot would have virtually no value. In that context, it would be clearly and unimpeachably a gift to the Estate for the City to demolish the structure and charge the cost thereof against the land. The only way for the City to recoup the cost of the demolition of this building is by payment from the defendant.
If a municipality remediates a nuisance or a violation of law as a service for a private property owner, the municipality must make all reasonable efforts to be compensated for the cost of the remediation. To do any less would fly directly in the face of the State Constitution — and this contract, and Contract Two, both take that flight.
iii. Contract Two
Contract Two, modified by the attorney for the Estate and signed by the executrix only, is likewise void as it would not obligate the Estate to be personally responsible for any cost of demolition, thereby clearly creating a gift of public funds in violation of the State Constitution. There is a provision of the contract that allows the City to place a special assessment against the property. This contract proposes only that a special assessment be levied against the valueless property pursuant to section 20 (35) of the General City Law. As mentioned above, the provision of the second contract which would allow the City to place a special assessment against the property is the same language that was proposed by the City in the first contract and is unconstitutional for the same reasons set forth above.
This document memorializes what the Corporation Counsel verbally advised the defendant. It acknowledges a potential gift, but it does not create a binding obligation because of its unconstitutionality.
iv. The Oral Contract
Any oral contract which would forgive the property owner’s liability for the cost of demolition would also violate article VIII, § 1 of the New York Constitution for the reasons set forth above.
In summary, the negative policy implication posed by any of the alleged agreements is that the taxpayer is unconsti *701 tutionally put at risk. Landlords owning property in marginal or blighted neighborhoods, if held harmless from the ultimate cost of repairing or removing their deteriorating building, would obviously be best served by continuing to collect rents for as long as possible, put no money whatsoever into the building, and, once it had deteriorated past use, allow it to go for taxes and let the City deal with the downside. While allowing all that to happen, a rational owner would positively hope for an insured casualty, knowing that a final windfall could be earned from a valueless property with the resulting mess left to others (the taxpayers) to clean up. The owner thus gets to enjoy the fruits of capitalism on the upside and the protections of socialism on the downside, to the City’s detriment. Based upon the proof presented, it is unfortunate that the longstanding unwritten policy of not holding property owners responsible for demolition costs has been in place for so many years. The testimony in this case confirms the existence of this long-standing policy. Moreover, as is more specifically set forth below, the court takes judicial notice that the City, in cooperation with the County, enlisted the aid of the National Guard in 1997 and demolished several hundred buildings on properties taken for taxes that were abandoned and in comparable condition to the property involved herein. This policy is unconstitutional and must be terminated immediately.
II. Enforcing the Law is Not Selective Enforcement
Defendant asserts a defense based on the City’s longstanding policy of not seeking restitution from property owners for demolition and allowing property not in code compliance to be taken for taxes. The defendant asserts it is entitled to the same treatment.
The defense of “selective enforcement” requires a showing that enforcement was undertaken against some but not against others and that the decision to enforce/not to enforce was predicated upon “invidious discrimination” against a constitutionally protected group.
Thus to properly consider the defense of selective enforcement, an analysis of the code enforcement history of the City and its present status is required. For this purpose, the court will review the recent history of code enforcement, the respective duties of the City and the County, and apply the same to the case at bar.
A. History of Code Enforcement
The historical code enforcement efforts of the City of Utica and the County of Oneida are at best inconsistent, and at worst *702 lax. In 1997 the City and County, in response to repeated arsons, invited the Federal Emergency Management Agency and the National Guard among others to participate with City and County Government in an intensive, extensive demolition program. Hundreds of vacant, abandoned and dangerous residential and business structures were demolished in this effort. Unfortunately most of the demolished structures were owned by the City and County and had been taken for taxes after the City and County, throughout the late 1980’s through 1995, had systematically failed to hold the abandoning private property owners accountable for codes compliance. The court takes judicial notice of these historical facts and these current events. (Sommers v Sommers, 203 AD2d 975 [4th Dept 1994]; Matter of David T., 102 Misc 2d 956 [1980]; Kruger v Page Mgt. Co., 105 Misc 2d 14 [1980]; Matter of Consolidated Edison Co. v Public Serv. Commn., 47 NY2d 94, 110; Dougherty v 425 Dev. Assocs., 93 AD2d 438; East Forty-Four Assocs. v Ewell, 138 Misc 2d 235, 240, n 3; 610 W. 142nd St. Owners v Braxton, 137 Misc 2d 567.)
Since that time the City has endeavored to monitor and keep up with the number of abandoned and/or dangerous structures in the City, but that effort has not kept pace with the overall deterioration. The table below illustrates the substantial number of properties taken for nonpayment of taxes in a City of fewer than 60,000 people with approximately one half of those properties requiring structures located thereon to be demolished at the taxpayers’ expense.
Properties Taken for Taxes Properties Demolished
1997 194 110
1998 211 92
1999 129 60
2000 183 84
2001 to date 192 17
The fact that the City regularly demolishes the structures located on one half of the properties taken for taxes prompts the inescapable conclusion that these properties had a long history of code noncompliance prior to tax foreclosure. Adding to the City’s burden is the damage to buildings caused by fire. In less than one year from 1998 to 1999, the City had 129 fire incidents, 30 of which caused major structural damage.
*703 Of the structures above that were demolished, six were privately owned, the rest were owned by the City having been taken for nonpayment of taxes. All but one of the structures since 1997 were demolished by the City Public Works Department. The average cost to the City to demolish a one-family structure is $8,023 and the average cost to demolish a two-family structure is $10,480. With regard to all of these demolitions, the City obtained two judgments against the properties and had the liens satisfied when the property changed ownership. The City has budgeted $200,000 for residential remediation/demolition in the current fiscal year.
The Oneida County Health Department has performed six demolitions of properties due to the hazardous health conditions of those houses. Each of the properties had private owners, each property was damaged because of fire and the County Health Department has not yet held any of the owners of such properties personally responsible for the costs of demolition.
B. Duty of the City
The City of Utica has a duty to enforce its Housing Standards Code. The Housing Standards Code is very specific in providing “unsafe Buildings [are] prohibited.” Moreover, the City of Utica Housing Standards Code allows the City to obtain the cost of demolition by charging the cost of demolition against the property or by commencing a special proceeding under CPLR article 78 (Housing Standards Code §§ 2-12-100, 2-12-101).
The Housing Standards Code specifically provides that:
(1) “No person, firm or corporation or association owning * * * a building in this City shall permit, suffer, or allow said building now or hereafter to become unsafe to the public and/or residents from any cause whatsoever” (§ 2-12-93).
(2) “Inspections must be made of all unsafe buildings.” (§ 2-12-94 [emphasis supplied].)
(3) “The Codes Commissioner shall consider the report of the Building Inspector and if in his/her opinion the report so warrants, shall determine that the building is unsafe and order its demolition or repair” (§ 2-12-95).
(4) Unsafe is defined in Housing Standards Code § 2-12-92 as including:
(1) Leaning or bulging wall;
(2) 33% or more of damage to supporting members or 50% damage to the overall structure;
*704 (3) Improperly distributed loads;
(4) Sufficient damage by fire and wind to cause danger to life, safety of general health, and welfare of the occupants of this City;
(5) Sufficient dilapidation to be unsafe for human occupancy;
(6) Inadequate facilities to support life;
(7) Inadequate facilities for fire ingress and egress;
(8) Parts of the structure may detach causing danger;
(9) Debris and rubble from fire;
(10) Unsafe, unsanitary and crowded;
(11) Vacant and left open at doors and windows;
(12) Unfit for occupation because of owner failure.
The court finds that the structure involved in the case at bar, prior to its demolition and from the time of the fire, violated the following subdivisions of the above section: (2), (4), (5), (6), (7) and (11). This structure existed in an unsafe and dangerous condition for 3¥a years, with no action commenced and with insurance proceeds available from the fire to fund the demolition. The City had the specific duty to prohibit the continued existence of this unsafe building, the legal means to demolish this structure 3V2 years ago, the authority to collect the cost of said demolition from the Estate, and a fund from which to collect the cost.
C. Duty of the County
The County had a duty pursuant to section 1304 of the Public Health Law “to investigate and abate public nuisances which may affect health.” The structure in question was clearly dangerous to the public. New York courts have previously held that structures can constitute a public nuisance. (Matter of Griswald v Village of Penn Yan, 244 AD2d 950 [4th Dept 1997]; Matter of Shedrick v Board of Health, 204 Misc 545 [Sup Ct, Steuben County 1953]; McComb v Town of Greenville, 160 AD2d 779 [2d Dept]; Matter of 300 W. 154th St. Realty Co. v Department of Bldgs., 55 Misc 2d 37.)
The court finds that this structure had been an unabated public nuisance since the 1997 fire. Inexplicably, the County failed to act for 3 ¥2 years to demolish this structure which it asserted was dangerous to the health and well-being of children in the neighborhood.
*705 D. The City and County Have Abused Discretion
It is clear from the proof that generally there are several different recurrent structural scenarios that are subject to code enforcement and/or demolition. They include:
(1) A property that sustains a fire and incurs significant damage. The record indicates there are approximately 30 structures damaged in this way annually;
(2) A property that has declined and has substantial codes violations and upon which taxes are unpaid. The record indicates that a substantial number of properties in this category are taken annually;
(3) A property that is abandoned, empty, and has significant code violations. The record indicates that one half of the properties taken for taxes are demolished.
The proof in this case demonstrates to the court that several hundred structures fall into the above categories at any given time in the City of Utica. The executrix of the Estate and the attorney for the Estate were reassured by the City that the Estate would not be charged for demolition of this property by City employees. City witnesses have acknowledged that it was a long-standing practice of the City not to seek the cost of demolition personally from a private property owner. As noted in I. B. i. above, the court accepts that the Estate was induced into inactivity on the demolition by the City’s representations and its well-known, long-standing past practices of not charging private owners for demolitions and/or allowing noncompliant properties in need of demolition to be taken for taxes without pursuing reimbursement for the cost of demolition prior to tax foreclosure.
The court takes judicial notice of the status of the housing stock within the City of Utica and finds that there are a substantial number of buildings that meet the above descriptions that have been and remain unaddressed by either the City or the County. (Kruger v Page Mgt. Co., 105 Misc 2d 14 [1980]; Matter of Consolidated Edison, 47 NY2d 94, 110; Dougherty v 425 Dev. Assocs., 93 AD2d 438; East Forty-Four Assocs. v Ewell, 138 Misc 2d 235, 240, n 3; 610 W. 142nd St. Owners v Braxton, 137 Misc 2d 567; Richardson, Evidence § 56, at 34-35 [Prince 10th ed].) The court finds that the City and County pursuant to the Housing Standards Code, the Public Health Code, the Public Health Law, and the Sanitary Code have an affirmative duty to:
(1) In example (1) above, ascertain immediately if there are insurance proceeds and seek immediate injunctive relief to *706 prevent the payment of insurance proceeds until the fate of the structure is secured by either demolition or rehabilitation;
(2) In example (1), (2) and (3) above, seek prompt codes remediation of the premises and/or demolition of the same prior to the property being taken by the City and County for taxes.
While the City and its departments have some discretion regarding enforcement under the City Housing Standards Code, the court finds in this case that the City abused its discretion and was arbitrary and capricious in failing to enforce the Housing Standards Code with regard to this property. From the proof presented the court finds a pattern on the part of the City over many years of failing to enforce the City Housing Standards Code prior to property being taken for taxes, allowing the title to the property to revert to the City and then demolishing the structure at the taxpayers’ expense. In fact the executrix for the defendant acknowledges in her testimony that she was waiting for this property to be foreclosed upon for taxes if the City did not demolish the property at no cost prior to the foreclosure. The affidavit submitted by the Assistant Corporation Counsel acknowledges 363 demolitions in the last five years, six of which were performed on private property. This confirms that the City and County have not aggressively pursued its remedies regarding buildings that are likely candidates for demolition while privately owned. Assuming a worst case scenario, the cost of this inaction to the taxpayers is $3,000,000 in uncollected demolition costs over the past five years. A similar course of inaction was charted for this property until the County finally commenced this proceeding pursuant to the newly adopted County Sanitary Code (enacted in late 2000 and effectuated in the spring of 2001) and the City subsequently intervened.
The County Health Department had a duty to promptly re-mediate this public nuisance. In failing to act for over three years the County was also repeating a pattern followed over many years of failing to treat significant codes noncompliance as a public health nuisance. Any building destroyed by fire, abandoned, or occupied while significantly out of compliance with codes is a presumptive public nuisance and requires immediate action to remediate the same pursuant to the aforementioned section of the Public Health Law. The newly adopted Sanitary Code enhances the duties and powers of the Health Department to immediately remediate dangerous public nuisances like this property.
*707 E. There is No Proof of Selective Enforcement; There is Clear Proof of a Failure to Enforce
The statistics cited above demonstrate that in most years approximately half of the properties taken by the City for taxes are ultimately demolished at the City’s expense. The argument of the defendant in this case that this unfortunate pattern should be followed in the case at bar and that by not doing so the City is selectively enforcing the law against the defendant is unpersuasive. Indeed, this court finds that the City and the County, by delaying the enforcement of codes and allowing nuisances to exist until taking a property for taxes and thereafter demolishing the same, unconstitutionally grant a gift of public funds for private purposes. This pattern has cost the taxpayers millions of dollars since the mid-1980s and has wrongly degraded neighborhoods.
“Selective enforcement” is not an applicable defense in this case because the defendant is not a member of a class suffering invidious discrimination. The only parties being harmed by the conduct of the City and the County are the owners and residents in neighborhoods where structures like this one exist and are unremediated, and the taxpayers who have for the past decade paid to demolish buildings for which the property owner should have paid. Thus, while there is no question but that enforcement has been woefully inadequate generally, there is no showing that these defendants have been subjected to “invidious discrimination.” The standard was articulated by the Court of Appeals in Matter of Di Maggio v Brown (19 NY2d 283 [1967]), citing the United States Supreme Court decision in Yick Wo v Hopkins (118 US 356 [1886]):
“Yick Wo has been interpreted and applied in many instances by both the Supreme Court and other courts, and the test to be used in determining whether there exists a violation of the equal protection clause of the Constitution has been refined to the point of clarity and preciseness.
“ ‘The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or person * * * or it may only *708 be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself * * * But a discriminatory purpose is not presumed * * * there must be a showing of “clear and intentional discrimination” * * *’ (Snowden v. Hughes, 321 U.S. 1, 8 [1944]; citations omitted.) “ ‘The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.’ (Williamson v. Lee Opt. Co., 348 U.S. 483 [1955].)
“And one need prove more than mere nonenforcement as against other violators:
“ ‘[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged.’ (Oyler v. Boles, 368 U.S. 448, 456 [1962].)”
Defendants’ “selective enforcement” defense cannot be, and was not, sustained.
Summary
While the court concludes that there were likely elements of a contract implied in law, because the subject matter of the contract violated article VIII, § 1 of the New York Constitution by granting an illegal gift of public funds, the alleged contract implied in law would be void and unenforceable.
The court finds that the recurrent actions and practices both of the City of Utica and the County of Oneida by which they fail to address flagrant significant code violations, knowing that for months and years property taxes are unpaid on the offending property, and then, after tax foreclosure, demolish the property at taxpayers’ expense, are gifts of public funds in violation of the New York Constitution. The court finds that the City’s and County’s customs and practices of (1) not enforcing the Housing Standards Code, the Public Health Code, the Public Health Law, and the Sanitary Code; (2) allowing property not in codes compliance that has had a fire or substantially deteriorated to be foreclosed for taxes rather than enforcing codes compliance prior to foreclosure; or (3) demolishing a *709 privately owned property without seeking full restitution either personally against the property owner or by lien pursuant to the General City Law (or both) all to be failures that violate the gifts provisions of the State Constitution, and the statutory and local code obligations of those governments.
It is an abuse of discretion and arbitrary and capricious for each government to delay addressing long-term, dangerous codes violations, while taxes upon the parcel are unpaid, until each government must foreclose for nonpayment of taxes.
Holding
Judgment is granted to plaintiffs. The court finds:
1. Defendant owes the cost of demolition. An inquest to establish the amount owing is set for November 26, 2001 at 9:00 A.M.
2. The defendant is enjoined from expending $15,000 of the insurance proceeds pending the inquest.
3. There was no enforceable contract implied in law because the underlying premise of such a contract violates article VIII, § 1 of the New York Constitution. There was no contract between the parties which released the defendant from reimbursing the City and/or County for the cost of demolition because there was no agreement, no consideration, and any such contract would violate the State Constitution.
4. The City and County must attempt to collect the cost of demolition from this property owner personally and cannot resort to a lien against the property where the cost of demolition exceeds the value of the property because that would be a gift in violation of article VIII, § 1 of the New York Constitution.
5. The City and the County’s common practice of not seeking reimbursement for demolition costs violates article VIII, § 1 of the New York Constitution.
6. The common practice of the City and County of allowing a property in long-standing codes noncompliance to be taken for taxes and then demolished at taxpayers’ expense is an abuse of discretion and violative of article VIII, § 1 of the New York Constitution.
7. There is no selective enforcement in this case. The City and County did abuse their discretion in failing to immediately proceed to have this property demolished.
8. The third-party claim against REB is severed.