JAMES R. DOUGHERTY, III, Appellant, v 425 DEVELOPMENT ASSOCIATES et al., Respondents.

First Department, May 10, 1983

APPEARANCES OF COUNSEL

*Herbert B. Rose* of counsel (*Rose & Boxer,* attorneys), for appellant.

*Harvey S. Feuerstein* of counsel (*Herrick, Feinstein,* attorneys), for respondents.

OPINION OF THE COURT

SULLIVAN, J.

On September 3, 1980 plaintiff purchased the stock allocated to a penthouse apartment in premises at 425 West End Avenue and the proprietary lease therefor from defendant 425 Development Associates (the Sponsor) for the sum of $282,000, of which $81,875 was paid in cash. The balance was paid by delivery of a $200,220 promissory note, payable in monthly installments of interest only, commencing October 2, 1980, and two lump-sum payments of $100,110 each, due on January 2, 1981 and July 2, 1981. The note provided that in the event of default or of the occurrence of any other "Event of Default" under a security agreement executed simultaneously therewith, by the terms of which the stock was pledged and the proprietary lease assigned to the Sponsor, the entire unpaid principal balance would "immediately become due and payable" at the Sponsor's option.

Initially, plaintiff made the required interest payments, and paid the principal installment due on January 2, 1981. In April, however, the co-operative corporation brought a summary dispossess proceeding against him after terminating his proprietary lease for engaging in "violent, disruptive and intimidating conduct in and around the building * * * vandalizing * * * the halls and other parts of the premises * * * disturbing other shareholders of the apartment * * * in the middle of the night on the house telephone [and by] excessive noisiness and intemperate behavior". Plaintiff did not contest these allegations. Instead, on or about May 12, 1981, he stipulated to the entry of a final judgment which granted the co-operative corporation pos-

session, but stayed issuance and execution of the warrant until July 31, 1981, with the understanding that in the interim plaintiff would make "diligent" efforts to sell the shares allocated to his apartment.

Since plaintiff's consent to the final judgment and the events leading to it constituted an event of default under the terms of the security agreement the Sponsor, by letter dated June 3, 1981, notified plaintiff that he had 10 days within which to cure and that, if such cure were not forthcoming, it was thereby exercising its option to accelerate payment of the entire indebtedness. Copies of the notice were sent, as required by the security agreement, to plaintiff at 425 West End Avenue, and to the Texas Commerce Bank.

Despite the notice, the Sponsor did not treat the indebtedness as accelerated since the balance was due in normal course in two weeks, on July 2, 1981. Plaintiff, however, never made this final payment, and proffered, instead, interest payments on July 2, 1981 and on or about July 29, 1981. The Sponsor returned both by letter indicating that partial payment was unacceptable and that the balance was now overdue.

On August 27, 1981, some seven weeks after the July 2, 1981 payment had become due, the Sponsor sent formal notice, by certified mail, return receipt requested, to plaintiff at his last known address (425 West End Avenue) and to the Texas Commerce Bank that, pursuant to the security agreement and section 9-504 of the Uniform Commercial Code, it would sell the stock and proprietary lease at a public sale on September 14, 1981. During the first week of September, 1981, the Sponsor's attorneys received a signed postal return indicating the Texas Commerce Bank's receipt of the notice on August 31, 1981. The Sponsor did not learn until approximately September 23, 1981, nine days after the September 14, 1981 foreclosure sale, that the other copy of the notice, sent to plaintiff at 425 West End Avenue, had gone unclaimed.

■ On November 17, 1981, plaintiff commenced this action to declare the foreclosure sale null and void, alleging, in substance, that he had not been given adequate advance notice and that the price obtained from the pur-

chaser, defendant Penthouse A Associates, did not reflect the fair market value of the stock and lease. When plaintiff moved for summary judgment the Sponsor cross-moved for summary judgment dismissing the complaint. Special Term granted the cross motion. Since we find an issue of fact as to whether the collateral was disposed of in a commercially reasonable manner, the matter should be remanded for trial on that issue.

Plaintiff renews his arguments made at Special Term that the Sponsor did not, as a matter of law, give him "reasonable notification" of the foreclosure sale as required by subdivision (3) of section 9-504 of the Uniform Commercial Code, or effective notice of acceleration as required by the security agreement.

Subdivision (1) of section 9-504 of the Uniform Commercial Code provides that after default a secured party may "sell, lease or otherwise dispose of any or all of the collateral". Subdivision (3) of section 9-504 requires that "reasonable notification of the time and place of any public sale" of collateral be given to the debtor. Although the expression "reasonable notification" is not expressly defined in article 9 of the code (see Uniform Commercial Code, § 9-504, Comment 5), it is clear that subdivision (3) of section 9-504 does not require the secured party to insure that the debtor actually receive notice, but only that reasonable measures be taken to notify the debtor of any scheduled sale of collateral in sufficient time to enable him to protect his interests if he so desires. (See Uniform Commercial Code, § 1-201, subd [26]; see, also, § 9-504, Comment 5.)

Subdivision (26) of section 1-201 clearly distinguishes between giving and receiving notice:

"A person 'notifies' or 'gives' a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person 'receives' a notice or notification when

"(a) it comes to his attention; or

"(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications."

Similarly, under subdivision (38) of section 1-201, notification is "sent" when it is "deposit[ed] in the mail or deliver[ed] for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances." Thus, under the general provisions of the code, it is clear that the requirement of "giving" or "sending" notice is satisfied even though the notice is not actually received, as long as reasonable steps were taken to notify the other party.

Moreover, those courts which have construed the "reasonable notification" provision of subdivision (3) of section 9-504 have consistently held that actual receipt is not required, only a showing that the secured creditor took reasonable steps to notify the debtor of the foreclosure. (See, e.g., *Hudspeth Motors v Wilkinson,* 238 Ark 410; *Steelman v Associates Discount Corp.,* 121 Ga App 649; *Tauber v Johnson,* 8 Ill App 3d 789; see, also, *Manhattan Taxi Serv. Corp. v Checker Cab Mfg. Corp.,* 226 App Div 624 mod on other grounds 253 NY 455; *Commercial Credit Corp. v Ornstein,* 245 App Div 815.) As the court noted in *Steelman v Associates Discount Corp.* (*supra,* pp 651-652), "[w]e think that here, in using certified mail, return receipt requested, the plaintiff took reasonable steps as a matter of law, to give the other party notice, notwithstanding the testimony of the defendant disclaiming receipt or knowledge of the notice, even if accepted as true." To require actual receipt would unduly inhibit the efficacy of the statute. "Various conditions might well exist which would make actual receipt of the notice impossible. If such requirement existed the defaulting vendee would have it in his power to thwart the sale." (*Elm Buick Co. v Moore,* 150 Conn 631, 635.)

█ In this case, we conclude, as did Special Term, that the secured creditor, the Sponsor, acted reasonably in sending its foreclosure notice to the two addresses specified in the security agreement. Indeed, in accordance with section 9-501 (subd [3], par [b]) and subdivision (3) of section 9-504 of the code, the specification of particular

addresses for the sending of notice constitutes an express agreement between the parties as to the standards to be used in determining the "reasonableness" of the manner of giving notice. (See, generally, *Flickinger Co. v 18 Genesee Corp.*, 71 AD2d 382.) Thus, the Sponsor cannot be faulted for having followed the notice procedure set forth in the parties' agreement, particularly since it is clear that plaintiff actually received notice within the meaning of section 1-201 (subd [26], par [b]) of the code by virtue of the delivery of the notice to the Texas Commerce Bank, its notice designee in the security agreement, two weeks before the scheduled sale.

In support of his contention that the method of notification in this case was unreasonable, plaintiff argues that the Sponsor should have ignored ·the directions in the security agreement and, instead, sent notices to either Eugene Harley, the attorney who represented him in the summary proceeding, or Fred Penn, who, as his "attorney-in-fact," made the interest and principal payment to the Sponsor, or both. This argument is flawed, however, since it presumes that the Sponsor had reason to believe that the method of giving notice specified in the security agreement was inadequate.*

Moreover, the Sponsor had no reason to doubt that at least one of the notices it sent had actually reached plaintiff in a timely manner since, well in advance of the sale, it received a return receipt demonstrating the Texas Commerce Bank's actual receipt of the notice two weeks before the sale. Furthermore, since the Sponsor did not learn until after the foreclosure sale that the notice sent directly to plaintiff at his apartment had been returned "unclaimed", it had no reason to doubt that this notice too had reached plaintiff's attention. Thus, there was no reason at the time of the foreclosure sale for the Sponsor to search

---

* The record does not support the conclusion that Mr. Penn, plaintiff's "attorney-in-fact" had replaced the Texas Commerce Bank as his trustee, much less the additional conclusion that the Sponsor was aware of any such replacement. Indeed, the record does not disclose any circumstance whatsoever that would cast doubt on the Sponsor's justifiable assumption that, while Mr. Penn was making certain payments on plaintiff's behalf, the Texas Commerce Bank was still the proper party to notify in the event of a sale of the collateral.

out other parties, such as Harley or Penn, to notify. A secured creditor is not obligated to use every possible avenue of communication known to him to insure that notice is actually received. Subdivision (3) of section 9-504 of the code is satisfied if the secured creditor acts in good faith and gives notification by taking "such steps as may be reasonably required to inform the [debtor] in ordinary course". (Uniform Commercial Code, § 1-201, subd [26]; see, e.g., *Tauber v Johnson,* 8 Ill App 3d 789, *supra.*)

Similarly without merit is plaintiff's contention that his change of residence imposed an additional duty on the Sponsor to take steps to provide notice through parties not specified in the security agreement. Although the Sponsor was aware that plaintiff had agreed to vacate his apartment, there is no evidence that the Sponsor knew or had reason to know that he had, in fact, done so. More importantly, even if the Sponsor had known that plaintiff had moved, it would not have been required to make further efforts to locate him, since the security agreement provided for an alternative method of notification, i.e., notice to the Texas Commerce Bank, and the Sponsor had every reason to believe that this method of notice had been effective.

Notice by certified mail to the debtor's last known address, even without an alternative method of notification, has been accepted by the courts as a suitable form of notice. (See *Steelman v Associates Discount Corp.,* 121 Ga App 649, *supra; Tauber v Johnson,* 8 Ill App 3d 789, *supra.*) *Mallicoat v Volunteer Fin. & Loan Corp.,* 57 Tenn App 106, upon which plaintiff relies, offers little comfort, since there the secured party learned that the foreclosure notice mailed to the debtor had been returned unclaimed before the foreclosure sale, but took no further steps to notify the debtor although it knew where he was employed and where his parents resided. Under those circumstances, the court held that in failing to go beyond its initial mailing the secured party had not acted reasonably under subdivision (3) of section 9-504 of the code. Here, in contrast, neither of the mailings had been returned unclaimed at the time of the foreclosure sale, and, in fact, the Sponsor had affirmative proof that at least one had reached the addressee.

Plaintiff also argues that, because of the Sponsor's failure to comply with the provisions of the security agreement requiring notice of acceleration, it was not entitled to foreclose upon and sell the collateral. The clause upon which plaintiff relies, in pertinent part, provides: "In the event of the occurrence of any one or more * * * Events of Default continuing for ten (10) days after written notice thereof, and if the Secured Party elects to accelerate the indebtedness, then provided that written notice of said election to accelerate * * * shall be given by the Secured Party * * * and that the Debtor shall fail to pay said indebtedness within ten (10) days of the mailing of said notice, then the Secured Party * * * may [dispose of the collateral]".

The argument concerning a second notice is academic, since it is based upon a notice provision which is triggered only when the secured creditor exercises its option to accelerate the indebtedness. As is apparent from its language, the clause requires the secured party to give the debtor notice of default and of its intention to accelerate in situations where a default occurs during the term of the note. Since the entire balance on the note was due on July 2, 1981, the Sponsor did not, in fact, have to exercise its option to accelerate any of the payments, and the clause in question is inapplicable. Although the Sponsor initially undertook to accelerate the indebtedness by sending plaintiff the June 3, 1981 notice of default, it never actually relied on that default by demanding payment of the full outstanding balance before July 2, 1981, the date the final payment would otherwise have become due.

When plaintiff failed to make the final payment he was in default for the second time. Since no further installments were due, there was nothing to accelerate and thus no need to send a further notice. Under section 3-122 of the Uniform Commercial Code, a cause of action against the maker of a note accrues on the day after maturity, and no demand is necessary to charge the maker. Thus, after plaintiff defaulted on his final payment, no demand for payment or notice of default was required, and the Sponsor, as a secured creditor, was within its rights in disposing of the collateral pursuant to section 9-504 of the code.

Neither the code nor the security agreement required the Sponsor to provide any notice other than that of the foreclosure sale before it exercised that right.

Contrary to the Sponsor's assertions, however, plaintiff did raise the issue of the *bona fides* of the sale of the stock and proprietary lease at Special Term. In both the complaint and affidavit in support of his motion for summary judgment he alleged that the price paid at the foreclosure sale did not reflect the true market value of the stock and proprietary lease; he argues that since he has not received any of the proceeds of the foreclosure sale, the purchase price, after deducting the expenses of sale, if any, must have been less than the $100,110 balance or less than 35% of the original purchase price of $282,000, towards which he paid $181,890, excluding interest. The foreclosure sale took place just one year after plaintiff had purchased the apartment. Since it is conceded that the purchaser at the foreclosure sale, defendant Penthouse A Associates, has offices at the same address as the Sponsor (care of the Sponsor's attorneys), plaintiff argues further that the sale was not an arm's length transaction at fair market value, but rather a sale to a nominee.

While the disposition of collateral may be by public or private sale and at any time and place and on any terms, "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." (Uniform Commercial Code, § 9-504, subd [3].) "[T]hat a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." (Uniform Commercial Code, § 9-507, subd [2].) Likewise, a sale for "a price much less than the original price does not by itself create a triable issue of fact." (*Marine Midland Bank v St. Louis*, 75 AD2d 972.)

The Court of Appeals has refrained from adopting an explicit test to assess commercial reasonableness, by noting that under the code a "lack of further particularization [as to reasonableness] invites consideration of accepted business practices as a guide to what is most likely to protect both debtor and creditor". (*Bankers Trust Co. v*

*Dowler & Co.,* 47 NY2d 128, 134.) At the same time the court did take note, approvingly, of two modes used to measure reasonableness, i.e., the "optimization of resale price" (see *Mercantile Fin. Corp. v Miller,* 292 F Supp 797; *Old Colony Trust Co. v Penrose Inds. Corp.,* 280 F Supp 698, 714), and "procedures employed" (*Matter of Zsa Zsa, Ltd.,* 352 F Supp 665, 671, affd 475 F2d 1393), thus legitimatizing their use as a barometer for measuring "commercial reasonableness".

■ As already discussed, the procedures employed by the Sponsor were designed to give plaintiff reasonable notice of the impending sale of the collateral. We do note, however, insofar as the proceeds of the sale are concerned, that although the Sponsor was not precluded from accepting a price less than plaintiff paid for the shares and proprietary lease, the realization of less than 50% of what he paid for the apartment one year earlier raises some concern about the sale itself, particularly since the purchaser was the Sponsor's nominee, and shared the same business address. Although "commercial reasonableness" is not tested by whether the sale of the collateral realized the optimum, or even the prevailing market price, since it is, after all, a distress sale, the secured creditor may not relax his efforts to secure the best price possible merely because he has recouped his investment. On this record, we cannot find, as a matter of law, that the issue of the commercial reasonableness of every aspect of the sale is foreclosed. In the circumstances an issue of fact is presented, at least as to whether the sale was at less than arm's length and whether the apartment in question could have commanded a better price. In this connection we take judicial notice of the generally ever-escalating increase in the cost of Manhattan co-operative apartments over the past decade.

Thus, a trial is in order as to whether every aspect of the sale, "including the method, manner, time, place and terms" thereof (Uniform Commercial Code, § 9-504, subd [3]), was commercially reasonable in protecting both the debtor and creditor. Inasmuch as this is the only aspect of the complaint as to which an issue of fact exists, we award defendants partial summary judgment (see CPLR 3212, subd [e]) on both elements of the notice issue. Since the

second and fourth causes of action are founded on plaintiff's claim of lack of notice to him, they were properly dismissed. The first cause of action must be reinstated to the extent it alleges that the purchase price did not reflect true market value, and that the stock and the proprietary lease were not sold to a bona fide purchaser. The third cause of action, based on unjust enrichment, may stand.

Accordingly, the order, Supreme Court, New York County (GALLIGAN, J.), entered on July 27, 1982, denying plaintiff's motion for summary judgment and granting defendants' cross motion for summary judgment dismissing the complaint, should be modified, on the law, without costs or disbursements, to reinstate the first cause of action, insofar as it alleges failure to obtain true market price, and the third cause of action, and except as thus modified, affirmed.

MURPHY, P. J., KUPFERMAN, SANDLER and ALEXANDER, JJ., concur.

Order, Supreme Court, New York County, entered on July 27, 1982, unanimously modified, on the law, without costs and without disbursements, to reinstate the first cause of action, insofar as it alleges failure to obtain true market price, and the third cause of action, and except as thus modified, affirmed.