**CHRISTIE'S INC., Plaintiff,**

v.

**Jerome DAVIS and Susan B. Davis, Defendants.**

**No. 02 Civ.0611.**

United States District Court, S.D. New York.

Nov. 27, 2002.

Daniel H. Weiner (Kristin B. Whiting, on the brief), Hughes Hubbard & Reed LLP, New York, NY, for Plaintiff Christie's Inc.

Gilbert C. Hoover IV, Jenkins & Gilchrist Parker Chapin LLP, New York, N.Y. (Karen F. Lederer, Jenkins & Gilchrist Parker Chapin LLP, New York, NY; David M. Perlmutter and Audrey Hirsch Bedolis, David M. Perlmutter & Associates, New York, NY, on the brief) for Defendants Jerome Davis and Susan B. Davis.

## OPINION AND ORDER

LYNCH, District Judge.

This action arises out of the efforts of plaintiff Christie's Inc. ("plaintiff" or "Christie's") to collect on multiple loans made to defendants Jerome and Sharon Davis ("defendants" or "the Davises"). The loans are secured by hundreds of pieces of fine and decorative art and antique furniture, most of which the Davises keep in their house in Greenwich, Connecticut. After the Davises defaulted on the loans, Christie's filed this action, seeking repossession of the collateral, pursuant to the New York recovery of chattels statute, C.P.L.R. Article 71. Plaintiff now moves for summary judgment. For the reasons discussed below, the motion will be granted.

## BACKGROUND

The Davises are art collectors who collect works by various nineteenth century European painters, as well as European and Chinese decorative art and objects. (Hedberg Aff. ¶ 2; Compl. Ex. G.) In September 1997, the Davises borrowed $4,500,000 from Christie's, executing a Secured Promissory Note (the "Note") and a Security Agreement in which the Davises pledged various artwork as collateral. (Compl.Ex. A.) The parties amended the Note and the Security Agreement five times as Christie's made additional loans to the Davises, and with each amendment, the Davises pledged additional works as collateral. (Id. Exs. B–F, I–N.) These amendments did not change the terms of the original Note in any material way; they simply increased the overall loan balance and added to the collateral. By the fifth amendment to the Note, in February 2001, the Davises' total indebtedness had reached $15,495,100. (Id. Ex. F.)

The works that secure the loan are listed on schedules attached to the Note and each of its amendments. Exhibits G and H to the Complaint synthesize the various schedules; Exhibit G lists the collateral works that are currently in the Davises' possession, and Exhibit H lists the collateral that is currently in plaintiff's possession. There is no dispute about the accuracy of these lists, except with regard to one painting by Corot, which appears on Exhibit G, but not in any of the schedules attached to the Note and the amendments. (J. Davis Aff. ¶ 3.)

According to Christie's, the Davises also provided additional collateral to the Note in September 2000, when they purchased several works of art from Christie's, using funds loaned to them under the Amended Payment Agreement, a financing agreement unrelated to the Note.[1] (Compl.Ex. O.) The Amended Payment Agreement states that "in order to secure the payment and performance of the obligations set forth herein, as well as any and all other obligations, liabilities and indebtedness owed by [the Davises] to Christie's, [they] shall ... pledge as collateral the property set forth on the attached Schedule D." (Id. Ex. O ¶ 6.) The schedule attached to the Amended Payment Agreement is actually labeled "Schedule I—Collateral," but this is apparently a typographical error, as the preceding three schedules are labeled, "A," "B," and "C," and the Agreement does not reference any schedules labeled "E," "F," "G," or "H." (Id. Ex. O.) Whatever the explanation for the discrepancy, it is undisputed that the works listed on Schedule I are the intended collateral to the Amended Payment Agreement.[2] The Davises have

---

1. The Amended Payment Agreement modified the Payment Agreement, entered into in May 2000, to increase the collateral in exchange for more loans. (Pl. Mem. at 6.)

2. Defendants state that, when they "sought in

not defaulted on the Amended Payment Agreement, but Christie's contends that the above-quoted language in Paragraph 6 of the Amended Payment Agreement establishes that the works listed in Exhibit P are also collateral to the Note and Security Agreement. (Pl. Mem. at 7.) The Davises disagree. (Defs. Mem. at 12–14).

The Note provides that its initial term would be two years, and that the parties could agree to extend the term for one year at a time, for a maximum of three additional years. (Compl. Ex. A ¶ 12.1.) The parties renewed the Note twice, so that its term finally expired on September 16, 2001. (Laird Aff. ¶ 12.) At that time, the Note matured, and the unpaid principal and interest became due in full. (Compl. Ex. A ¶¶ 1.1, 4.1.) Christie's notified defendants that their debt was due, and, pursuant to Paragraph 10.1 of the Note, gave them fifteen days to pay the amount due. (Laird Aff. ¶ 25; Compl. Ex. Q.) The Davises failed to pay even a portion of the debt within the fifteen days, and have conceded that they are in default. (J. Davis Aff. ¶ 2; Laird Aff. ¶ 27.)

The Note provides that, in the event of default, Christie's "shall have all the rights and remedies of a secured party under the Uniform Commercial Code with respect to the Pledged Property, including, without limitation, the immediate right to foreclose upon items of Pledged Property whose aggregate low presale estimate made by Christie's in its discretion equals twice the amount of such outstanding indebtedness and to sell such Pledged Property at auction or otherwise." (Compl. Ex. A ¶ 10.2.) In other words, Christie's is responsible for generating low and high estimates of the price that a particular work might fetch at a public auction (Pl. Reply Mem. at 6), and may foreclose on property whose aggregate value, using the low presale estimates, is twice the amount of the total outstanding indebtedness. The agreement expressly grants Christie's discretion in making the estimates and selecting the artwork for foreclosure. (Compl. Ex. A ¶ 10.2(i).) On January 7, 2002, after defendants refused to pay the amount due under the Note and Security Agreement (Laird Aff. ¶ 28), Christie's demanded that defendants make available for foreclosure all of the property pledged as security under the Note and the Amended Payment Agreement. (Compl. Ex. R.) The Davises did not comply with the demand. (Laird Aff. ¶ 29.)

On January 25, 2002, when Christie's instituted this action for replevin, the Davises owed $11,023,300. (Compl. ¶ 33.) Since then, the Davises have sold some of the collateral and used the proceeds to decrease the outstanding principal amount, so that as of April 30, 2002, the outstanding balance was at least $10,362,514.[3] The parties agree that the Davises subsequent-

discovery a true copy of Schedule D," "plaintiff coyly stated that defendants were already in possession of Schedule D," but that defendants "have no record of ever having received a copy of a Schedule D." (Defs. Mem. at 14 n. 7.) This is somewhat disingenuous, since defendants signed the Amended Payment Agreement, and presumably would not have done so without knowing exactly what collateral they were pledging. Since it is the items of collateral listed on the Schedule that are relevant for purposes of plaintiff's motion, rather than the Schedule as a unit, the discrepancy in labeling is not material. It is clear that the

relevant collateral is listed in Schedule I to the Amended Payment Agreement and in Exhibit P to the Complaint, regardless of the Agreement's reference to a Schedule D. In addition, Schedule I's accuracy is corroborated by plaintiff's other contemporaneous records of the collateral, which list all of the paintings in Schedule I. (Goldsmith Dep. Ex. D.)

3. According to Christie's, this amount was actually $10,522.254. (J. Davis Aff. ¶ 2.)

ly sold additional pieces, reducing the balance further. (Pl. Mem. at 2 nn. 2–3.) The Davises claim that by the end of May, the debt had been reduced to $8,357,044, and that as of June 13, they were about to pay Christie's another $1,484,000 from further sales. (J. Davis Aff. ¶¶ 4–5.) While the Davises correctly note that Christie's has not produced any documentation of the exact amount of the outstanding balance (Defs. Mem. at 9), it is clear that both parties agree that the balance is now less than it was on April 30, and as Christie's states, determining the exact balance is simply a matter of calculating the accrual of interest and deducting collateral sales. (Pl. Reply Mem. at 1.) At any rate, defendants acknowledge that they owe plaintiffs $6,873,044.

Shortly after filing its complaint, Christie's moved for summary judgment, seeking immediate possession of the property pledged under the Note and Security Agreement, and the Amended Payment Agreement (listed in Exhibits G, H, and P to the Complaint), and in the alternative, a judgment for the amount still owed by the Davises.[4] (Pl. Reply Mem. at 2 & n. 2.) Plaintiff also seeks attorneys' fees, as provided in the Security Agreement. (Compl. Ex. I ¶ 4(i).)

## DISCUSSION

### I. Summary Judgment Standard

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the party opposing summary judgment " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505).

■ Since Christie's moved for summary judgment shortly after defendants filed their answer to the complaint, defendants have had only limited opportunity for discovery, taking one deposition of a Christie's employee and serving discrete document requests. "Only in the rarest of

---

**4.** Plaintiff's Complaint also seeks damages for wrongful detention of the collateral (Compl.¶ 51), but plaintiff has agreed to withdraw this claim if the order of replevin was granted. (Pl. Mem. at 13 n. 9.) The Court will therefore not consider the claim.

cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000). "The nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989) (quoting *Anderson*, 477 U.S. at 250 n. 5, 106 S.Ct. 2505).

## II. *Plaintiff's Superior Right to Possession of the Collateral*

■ There is no genuine dispute between the parties as to the only issues relevant to plaintiff's right to foreclose on the collateral works. This is therefore one of the "rarest of cases" in which summary judgment for plaintiff is entirely appropriate, despite defendants' limited opportunity for discovery. *Hellstrom*, 201 F.3d at 97. Defendants concede that they are in default of the Note and Security Agreement (J. Davis Aff. ¶ 3; Laird Aff. ¶ 27), raise no defenses to their obligation to pay the amount due, and do not dispute Christie's contention that the plain language of the contracts gives Christie's the right to immediate possession of some amount of the pledged property.

The Note unambiguously provides that Christie's shall have the rights of a secured party under the Uniform Commercial Code ("U.C.C.") to foreclose on an amount of the pledged property with an aggregate value of twice the outstanding debt. (Compl. Ex. A ¶ 10.2(i).) The New York U.C.C. states that a secured party "may reduce a claim to judgment, foreclose, or otherwise enforce the claim [or] security interest ... by any available judicial procedure." N.Y. U.C.C. § 9–601(a)(1) (McKinney 2002). Accordingly, Christie's

has moved pursuant to C.P.L.R. Article 71 for an order of replevin as to the property to which the Note and Security Agreement entitle it. N.Y. C.P.L.R. § 7101 (McKinney 2002) ("An action under this article may be brought to try the right to possession of a chattel.").

■ In an action for recovery of chattels under § 7101, the sole issue is which party has the "superior possessory right" to the chattels. *Honeywell Information Systems, Inc. v. Demographic Systems, Inc.*, 396 F.Supp. 273, 275 (S.D.N.Y.1975). Because the defendants came into possession of the property lawfully, plaintiff must also establish that it made a demand for possession and was refused. *Solomon R. Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311, 567 N.Y.S.2d 623, 626, 569 N.E.2d 426 (1991). Since the Davises have conceded their default and the Note provides that Christie's has the "immediate right to foreclose" on the pledged property (Compl. Ex. A ¶ 10.2(i)), Christie's undoubtedly has the superior right to the collateral in the amount provided by the Note. Christie's demanded the return of the collateral on January 7, 2002, after defendants' default (Compl.Ex. R), and defendants ignored the demand. (Laird Aff. ¶ 29.) Having established its claim for replevin, Christie's is entitled to possession of property having an aggregate low presale estimated value of twice the outstanding debt. Taking the Davises' factual assertions as true, as this Court must on summary judgment, the amount of the debt is ·undisputed to the extent of $6,873,044, the amount remaining after the Davises allegedly made additional collateral sales subsequent to April 30, 2002. (J. Davis Aff. ¶ 4.) Christie's therefore has a superior right to possession of items of the pledged property having an aggregate low

presale value of $13,746,088.[5]

The Davises attempt to avoid this relatively straightforward conclusion by making several arguments—ultimately irrelevant to the simple issues implicated by plaintiff's claim—in an effort to create the appearance factual issues precluding summary judgment. Defendants' arguments fall into two categories. First, defendants contend that Christie's has not sufficiently established the elements of its action under § 7101, because it has failed to prove the value of each work that it seeks to repossess. Second, defendants attempt to create issues of fact relating to plaintiff's discretion in valuing and selling the collateral works speculating that plaintiff has exercised its discretion to appraise and sell the pledged property in bad faith, and that an auction sale of the foreclosed works will be commercially unreasonable. (Defs Mem. at 16, 19.) These arguments are unavailing.

First, defendants argue that Christie's must submit proof of the value of each item of the collateral, because "a party seeking possession of chattels pursuant to Article 71 must include a request, in the alternative, for judgment in its favor in the value of the chattels." (Defs. Mem. at 11.) Defendants rely on *Tollin v. Elleby*, 77 Misc.2d 708, 354 N.Y.S.2d 856 (N.Y.City Civ.Ct.1974), which holds that, where the plaintiff does not possess the disputed chattel, a judgment awarding the plaintiff the right to possession must include an alternative provision fixing the value of the chattel. *See* N.Y. C.P.L.R. § 7108 (McKinney 2002). This requirement is designed primarily to protect a plaintiff whose goal is to recover wrongly retained or stolen property, in the event that the defendant destroys the property subsequent to judgment, and plaintiff's only remedy becomes recompense for the value of the chattel. *Tollin*, 354 N.Y.S.2d at 862. Where the plaintiff's purpose in recovering the property is not possession of the property for its own sake, but the retention of security for a debt, the value provision is not required. N.Y. C.P.L.R. § 7108(b)(2) (McKinney 2002); *Allen v. Judson*, 71 N.Y. 77, 77 (1877) (holding that judgment in favor of mortgagee should not include alternative award of the value of chattel, but an alternative award of the amount of plaintiff's interest in the chattel); 23 N.Y. Jur.2d § 218 (2002). Here, therefore, the amount of money damages that must be included in the judgment is the undisputed amount due on the Note, rather than the value of the collateral. Thus, Christie's need not establish the value of any of the pledged property.

Second, the Davises contend that, even if Christie's has adequately estab-

---

5. These figures are based on Jerome Davis's sworn statement that he and his wife repaid $2,005,470 since May, and were about to repay another $1,484.000 to Christie's in June. (J. Davis Aff. ¶ 5.) While the Davises have not produced documentary evidence of their payments, Christie's also has not provided the Court with evidence that defendants have not made the payments. Thus, for the purposes of this motion, the Court will credit the Davises' assertions as to the amount of the debt, and consider $6,873,044 to be the currently undisputed outstanding amount. Defendants argue that their assertion that the outstanding debt is lower than plaintiff's figures precludes granting summary judgment for Christie's, but obviously this is not the case, since there is no dispute that defendants owe at least the conceded amount. While the figure representing the undisputed amount due may understate the actual total debt, that does not affect plaintiff's right to summary judgment for that portion of the debt and the corresponding amount of collateral, that is not in dispute. If after discovery the parties cannot agree on the precise amount of the debt, Christie's will be able to recover property whose value is twice any additional amount to which Christie's establishes that it is entitled.

lished its claim for replevin, issues of fact as to the valuation and sale of the works preclude granting summary judgment for Christie's. Defendants speculate that plaintiff's low presale estimates significantly undervalue the works, and that plaintiff intends to "engage in a fire sale of the collateral at prices well below the fair market value of the individual artworks." (Defs. Mem. at 19.) This theory breaks down into two related legal arguments: first, that Christie's exercised bad faith in valuing the works, and second, that any auction of the works will not be commercially reasonable. Neither argument raises an issue of fact as to plaintiff's entitlement to foreclose on the collateral.

Defendants' argument that Christie's has acted in bad faith rests mainly on the fact that some of plaintiff's estimates have decreased since initial estimates on many of the works were made in early 2000, (Defs. Mem. at 3–4), leading defendants to speculate that Christie's is lowballing the estimates in order to gain the right to foreclose on more items of collateral. (*Id.* at 4.) While the Note provides that the presale estimates are to be "made by Christie's in its discretion," (Compl. Ex. A ¶ 10.2(i)), this discretion is limited by the duty to act in good faith that inheres in every aspect of the transaction. *Hooley v. First Union Corp.,* No. 96 Civ. 2594(JSM), 1998 WL 132939 (S.D.N.Y. March 20, 1998). "Good faith" is defined in the New York U.C.C. as "honesty in fact and the observance of reasonable commercial standards of fair dealing." N.Y. U.C.C. § 9–102(43) (McKinney 2002).

Here, defendants have failed to create an issue of fact as to plaintiff's good faith in creating the presale estimates for each piece of artwork. A Christie's employee responsible for valuing the works ex-

plained in sworn testimony that decreases in the estimates were due to the decline in the economy, thin interest in the collateral items, and defendants' "indiscriminate" attempts to sell the collateral on their own. (Pl. Reply Mem. at 7 n. 6; Goldsmith Dep. at 9, 29–30, 32–33.) Defendants' expert, Dr. Gregory Hedberg, challenges this explanation, suggesting that the decrease in some of plaintiff's estimates cannot be explained by market conditions. (Hedberg Aff. ¶ 8.) He does not cite any facts to support his contention, however, simply listing his own estimates for several of the pledged works, and noting that they are higher than plaintiff's low presale estimates.[6] (*Id.* ¶¶ 6, 8.) Estimating the value of works of art is inevitably a subjective process that requires predicting and accounting for a variety of mutable factors, both economic and aesthetic. Therefore, the fact that one art dealer's valuations of some of the pledged works are somewhat higher than Christie's estimates is not in itself probative of the unreasonableness of those estimates, let alone bad faith, especially without any supporting documentation or explanation of the factors on which Dr. Hedberg's estimates are based. More telling than Dr. Hedberg's competing estimates is the fact that of the 52 items of collateral that have been auctioned, only 9 sold for more than their high presale estimate, and most were well within the two estimates (Laird Supp. Aff. Ex. A), suggesting that plaintiff's valuations were fairly accurate.

Defendants contend that the fact that many works have sold within plaintiff's estimates is simply more evidence of plaintiff's bad faith. Despite the fact that plaintiff's interest is in recovering its loans to the Davises through selling the collateral, rather than in gaining the collateral for

---

6. It is unclear whether Dr. Hedberg's estimates are the prices that the works could fetch at auction, or at private sales, which may bring higher prices. (Hedberg Aff. ¶ 7.)

its own sake, defendants speculate that Christie's has incentive to lower the estimates so that it can sell more of the works, because it earns seller's commissions and premiums with each sale. (Defs. Mem. at 4.) The Davises have failed to cite any specific facts to support this theory of plaintiff's motivation, or even any evidence that the valuations provided by Christie's, and the prices received at auction, are unreasonably low. Therefore, defendants' argument that Christie's has exercised bad faith in its valuation of the collateral works is no more than "mere conjecture [and] speculation," which does not provide a basis to deny summary judgment. *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir.1986).

■■■■ Defendants also make the related argument Christie's will dump the works on the market for "obscenely low prices," engaging in a "fire sale" that is commercially unreasonable. (*Id.* at 19 & n. 10.) The legal basis for this argument appears to be the New York U.C.C.'s requirement that foreclosure sales of collateral be "commercially reasonable." N.Y. U.C.C. § 9–610(b). Speculation about the reasonableness of the eventual sale of the collateral (a sale that the Davises have so far prevented by wrongly refusing to return the collateral) is premature, and is not relevant to plaintiff's right to foreclose under the Note. *Paco Corp. v. Vigliarola*, 611 F.Supp. 923, 925 (E.D.N.Y.1985), *aff'd* 835 F.2d 1429 (2d Cir.1987) (holding that questions of fact as to commercial reasonableness of sale do not affect judgment as to liability under security agreement).[7] If the property is eventually sold improperly

or collusively, the Davises can bring a separate lawsuit to challenge the commercial reasonableness of that sale. *See, e.g., Dougherty v. 425 Development Assocs.*, 93 A.D.2d 438, 462 N.Y.S.2d 851, 856 (1st Dep't 1983).

Even if the reasonableness of a prospective sale were relevant, the Davises have failed to create a material issue of fact that would preclude summary judgment. The Note expressly provides that the Davises agreed that sales of the collateral would be conducted, at Christie's discretion, "at auction or otherwise ... in accordance with its customary sales procedures," and that this would constitute a "commercially reasonable manner of sale." (Compl. Ex. A ¶ 10.2(i).) Nonetheless, the Davises now argue that items of collateral would receive higher prices if they were sold privately, rather than at auction, over a long period of time. (Hedberg Aff. ¶¶ 10–11; Defs. Mem. at 4.) Whether or not this is the case, defendants' argument fails for two reasons. First, the parties expressly contemplated that items of collateral would be sold by auction and that this would be reasonable; the Davises cannot now complain that sale by auction is per se commercially unreasonable, as this would contradict the clear intent of the parties at the time of contracting. Second, the fact that Christie's could in theory procure higher prices for some of the works by using private sales (if true) does not render a sale by auction commercially unreasonable. *See Chemical Bank v. Haseotes*, No. 93 Civ. 2846(LMM), 1994 WL 30476, at *4 (S.D.N.Y. Feb.1, 1994) (holding that failure to receive optimum price does not make

---

7. Likewise, the fact that Christie's is "oversecured" (Defs. Mem. at 4) is irrelevant to Christie's right to foreclose. The parties have contractually provided that Christie's may foreclose on property worth twice the total debt, with the result that if the proceeds of sales of the foreclosed property exceeds the amount of the debt, Christie's must return the surplus proceeds to the Davises. *See* N.Y. U.C.C. § 9–615(d) (McKinney 2002). Similarly, once Christie's has recovered the money it is owed, sales of the foreclosed property must stop, and any remaining collateral must be returned to the Davises.

sale commercially unreasonable). At any rate, any difference between private and auction prices is purely speculative at this point, as defendants have not proffered any concrete evidence that the prices would vary. *See Argus*, 801 F.2d at 42. Defendants have therefore failed to raise genuine issues of material fact as to the reasonableness of a potential auction sale of the collateral.

### III. *The Property on Which Christie's May Foreclose*

■ The property that Christie's is entitled to possess includes the works listed as collateral to the Note and Security Agreement, their five amendments, and the Amended Payment Agreement, and which have an aggregate low presale estimated value of twice the outstanding amount due, which are. The lists of collateral are synthesized in Exhibits G, H, and P to the Complaint. There is no dispute as to the items of property securing the Note and Security Agreement and their subsequent amendments, as represented by Exhibit G (works now in the Davises' possession) and H (works currently held by Christie's), except as to one painting. Corot's *Mornex (Haute Savoy au Fond)* appears on Exhibit G but not in any of the collateral lists attached to the actual agreements.[8] (Defs. Mem. at 14; Compl. Exs. A–F; I–N.) Since there is an issue of fact as to whether the Corot forms part of the collateral securing any of the agreements, Christie's may not foreclose on the Corot at this time.

Defendants contend that the property securing the Amended Payment Agreement (listed in Exhibit P) is not part of the collateral to the Note and Security Agreement, but this argument has no merit.

The Amended Payment Agreement provides that the collateral securing it would also "secure the payment of . . . any and all other obligations, liabilities and indebtedness owed by [the Davises] to Christie's." (Compl. Ex. O ¶ 6.) The Davises attempt to circumvent this unambiguous language by relying on the fact that the Amended Payment Agreement uses the term "Christie's" to refer collectively to Christie's–New York (the plaintiff in this action), Christie's–Monaco, and Christie's–London. (*Id.*; Defs. Mem. at 13.) They argue that when the Agreement refers to "Christie's," it must be referring to obligations owed to all three Christie's branches together, rather than obligations owed to any one of the subsidiaries. (Defs. Mem. at 13.) Since the Davises' obligations under the Note and Security Agreement are to Christie's–New York only, the collateral to the Amended Payment Agreement cannot also secure the Note and Security Agreement. (*Id.*)

This argument is obviously wrong. The Amended Payment Agreement uses the term "Christie's" to refer to all three branches as a convenient shorthand, not because any debts are owed to the three branches together. Thus, Paragraph 6 is best read as if the shorthand had been spelled out: the collateral to the Amended Payment Agreement will "secure the payment of . . . any and all other obligations, liabilities and indebtedness owed by [the Davises] to [Christie's–New York, Christie's–London, or Christie's–Monaco]." There is nothing in this language that indicates that obligations owed by the Davises to Christie's–New York (but not to the other two branches) would not be included. Thus, Christie's may foreclose on

---

8. This painting also appears on plaintiff's contemporaneous internal lists of the pledged works. (Goldsmith Dec. Exs. B–E.)

the collateral to the Amended Payment Agreement listed in Exhibit P.

### IV. *Order Pursuant to C.P.L.R. § 7109(b)*

 Because the pledged property is unique, Christie's seeks, in addition to a judgment that it has superior possessory rights in the chattel, an order pursuant to C.P.L.R. § 7109(b) directing the Davises to return the collateral to it. (Pl. Mem. at 13 n. 9.) Section 7109(b) provides that, "[w]here the chattel is unique, the court, in addition to granting a judgment under section 7108 [that plaintiff has superior possessory rights in the chattel], may direct that a party in possession deliver the chattel to the party entitled to possession." N.Y. C.P.L.R. § 7109(b) (McKinney 2002). While conceding that the paintings in their collection are unique, *see Danae Art International Inc. v. Stallone*, 163 A.D.2d 81, 557 N.Y.S.2d 338 (1st Dep't 1990), defendants argue that Christie's has not adequately established that the furnishings and decorative objects among the collateral are unique. (Defs. Mem. at 18.) Contrary to defendants' argument, the uniqueness requirement does not force plaintiffs to prove that each chattel is rare or irreplaceable, but simply that it is not a mass-produced item readily available on the market, such that a money judgment enabling purchase of a replacement would be an adequate remedy. *John Paul Mitchell Systems v. Quality King Distrib., Inc.*, 106 F.Supp.2d 462, 477–78 (S.D.N.Y.2000) (discussing uniqueness requirement and holding that mass-produced items cannot be unique). All of the furnishings and decorative objects in the Davises' collection are works created in Europe and China during the seventeenth through nineteenth centu-

ries. (Compl.Ex. D.) These are clearly unique, as they have historical and artistic value that makes them relatively rare, impossible to replace through manufacturing, and attractive to collectors and dealers.[9] *Morse v. Penzimer*, 58 Misc.2d 156, 295 N.Y.S.2d 125, 127 (1968) (holding that items with historical value and heirlooms are unique, while Ford trucks are not).

Christie's is therefore entitled to an order pursuant to § 7109(b) directing that the Davises return the collateral items valued at twice the undisputed debt amount. *See Kunstsammlungen Zu Weimar v. Elicofon*, 536 F.Supp. 829, 859 (S.D.N.Y.1981) (holding that the court could use its equitable discretion under § 7109(b) to direct the return of the chattels).

### V. *Attorneys' Fees*

The Security Agreement provides that "[d]ebtor shall pay ... court costs and attorneys' fees" incurred "in connection with the ... enforcement of this Security Agreement and the collections of the Indebtedness." (Compl. Ex. I ¶ 4(i).) Therefore, the Davises must pay the attorneys' fees and costs incurred by Christie's in prosecuting this action.

### *CONCLUSION*

Plaintiff is entitled to a judgment for $6,873,044, the undisputed portion of the Davises' outstanding debt. Under the Note and Security Agreement, plaintiff may satisfy the debt by foreclosing on items of collateral listed in Exhibits G and P to the Complaint, and by retaining items listed in Exhibit H, having an aggregate low estimated presale value of twice the amount of the undisputed portion of the Davises' debt. Pursuant to C.P.L.R.

---

9. The uniqueness of the pledged works is immediately evident from an examination of the descriptions of the works in the lists of collateral. Clearly, works such as the seventeenth-century "rhinocerous horn libation cup" and the nineteenth-century "flambe-glazed ling-zhi-shaped brush washer" (Compl.Ex. D) are unique art objects, rather than mass-produced, mainly functional, utensils.

§ 7109(b), defendants are directed to make available to Christie's items of collateral, selected by Christie's in accordance with the Note, having an aggregate low estimated value of $13,746,088.

The exact amount of the outstanding debt, beyond the judgment awarded today, remains in dispute. If necessary, the Court will order discovery, but it is apparent from the documents already submitted that determining the remaining amount, if any, to which Christie's is entitled, is simply a matter of calculating the accrual of interest and deducting any payments that the Davises have made. Therefore, the parties are directed to meet and confer regarding a mutually satisfactory disposition of the remaining disputes in this case, in order to avoid causing more attorneys' fees to accrue by protracting the litigation through further efforts by defendants to avoid their clear obligations.

Plaintiff shall submit an application for the amount of its fees and costs and an appropriate form of a judgment no later than December 31, 2002.

SO ORDERED.